DYKEMA GOSSETT LLP
E. Lee Horton, SBN: 57350
lhorton@dykema.com
Craig N. Hentschel, SBN: 66178
chentschel@dykema.com
S. Christopher Winter, SBN: 190474
kwinter@dykema.com
333 South Grand Avenue
Suite 2100
Los Angeles, California 90071
Telephone: (213) 457-1800
Facsimile: (213) 457-1850

Attorneys for Defendant
ATLANTIC INERTIAL SYSTEMS INC.

[Additional counsel listed on next page]

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOSANGELES, CALIFORNIA 90071

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

GYRODATA INCORPORATED, a Texas corporation,

Plaintiff,

vs.

ATLANTIC INERTIAL SYSTEMS INC., a California and Delaware corporation; et al.,

Defendants.

AND RELATED COUNTERCLAIM.

Case No. CV08-07897 GHK (FMOx)

**JOINT BRIEF RE: PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

Date: July 2, 2012
Time: 9:30 a.m.
Place: Courtroom 650
Hon. George H. King

Plaintiff Gyrodata Incorporated ("Gyrodata"), defendant Atlantic Inertial Systems Inc. ("AIS"), and defendants BAE Systems, Inc. ("BAE Inc."), BAE Systems Controls, Inc. ("Controls") and BAE Systems Information and Electronic Systems Integration Inc. ("IESI") (collectively the "BAE Defendants", and collectively with AIS, the "Defendants") respectfully submit the following Joint Brief on their respective motions for summary judgment or partial summary judgment.

MANATT, PHELPS & PHILLIPS LLP
Chad S. Hummel, SBN: 139055
chummel@manatt.com
Emil Petrossian, SBN: 264222
epetrossian@manatt.com
11355 West Olympic Blvd.
Los Angeles, CA 90064-1614
Telephone: (310) 312-4000
Facsimile: (310) 312-4224

FULKERSON LOTZ LLP
Thomas M. Fulkerson (Admitted Pro Hac Vice)
tfulkerson@tlotf.com
Wesley G. Lotz (Admitted Pro Hac Vice)
wlotz@tlotf.com
700 Louisiana Street, Suite 4700
Houston, TX 77002-2773
Telephone: (713) 654-5888
Facsimile: (713) 654-5801

Attorneys for Plaintiff
GYRODATA INCORPORATED
a Texas corporation

BUCHANAN INGERSOLL AND ROONEY LLP
Robert Edmunds, SBN: 89477
Robert.edmunds@bipc.com
600 West Broadway, #1100
San Diego, CA 92101
Telephone: (619) 239-8700
Facsimile: (619) 702-3898

Mary Sue Henifin (Admitted Pro Hac Vice)
Mary.henifin@bipc.com
George Benaur (Admitted Pro Hac Vice)
George.benaur@bipc.com
700 Alexander Park, #300
Princeton, NJ 80540
Telephone: (609) 987-6808
Facsimile: (609) 520-0360

Attorneys for Defendants
BAE SYSTEMS, INC., a Delaware corporation,
BAE SYSTEMS CONTROLS INC., a Delaware corporation,
and BAE SYSTEMS INFORMATION AND ELECTRONIC
SYSTEMS INTEGRATION INC.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

**TABLE OF CONTENTS**

DEFENDANTS' MOTION ........ 1

I. DEFENDANTS' ISSUE ONE: RECOVERY OF CONSEQUENTIAL DAMAGES FOR BREACH OF THE T70 CONTRACT IS BARRED BECAUSE THERE IS NO JUSTIFIABLE EXPECTATION OF SUCH DAMAGES ........ 1

1. Introduction ........ 1
2. The Contract is Clear and Unambiguous ........ 2
3. The T70 Contract Precludes Lost Profits Damages ........ 3

PLAINTIFF'S RESPONSE: GYRODATA'S LOST PROFITS WERE FORESEEABLE AND RECOVERABLE ........ 4

1. Gyrodata's profits not only were foreseeable but were foreseen ........ 4
2. The T70 contract also anticipated profit ........ 5
3. Lost profits are routinely awarded in best efforts cases ........ 6

II. DEFENDANTS' ISSUE TWO: CONSEQUENTIAL DAMAGES ON THE T70 CONTRACT AND FRAUD CLAIMS ARE BARRED BECAUSE PLAINTIFF CANNOT PROVE CAUSATION ........ 7

PLAINTIFF'S RESPONSE: DEFENDANTS' FAILURE TO USE BEST EFFORTS CAUSED LOSS ........ 8

III. BAE DEFENDANTS' ISSUE THREE: THE CLAIM FOR BREACH OF THE T70 CONTRACT AGAINST BAE INC. IS BARRED ........ 11

PLAINTIFF'S RESPONSE: EACH BAE DEFENDANT IS LIABLE UNDER THE T70 CONTRACT ........ 13

IV. DEFENDANT AIS'S ISSUE FOUR: PLAINTIFF'S CLAIM FOR BREACH OF THE T100 CONTRACTS IS BARRED BY APPLICABLE UCC PROVISIONS ........ 15

1. Introduction and Background Facts ........ 15
2. Gyrodata Failed To Give Notice Of Breach Within A Reasonable Time ........ 16
3. Gyrodata Waived Any Previous Breach By Acceptance ........ 17

PLAINTIFF'S RESPONSE: REASONABLE NOTICE WAS GIVEN ........ 18

1. Gyrodata gave adequate notice under section 2607(3)(A) ........ 18
2. Gyrodata did not waive its right to damages ........ 20

V. DEFENDANTS' ISSUE FIVE: PLAINTIFF'S FRAUD CLAIM IS BARRED BY THE ECONOMIC LOSS RULE .......... 21

1. Introduction .......... 21

2. The Economic Loss Doctrine .......... 22

3. Defendants Did Not Have A Duty Independent of the Contracts .......... 23

4. Gyrodata Has Not Been Exposed to Personal Damages .......... 24

5. Conclusion .......... 26

PLAINTIFF'S RESPONSE: THE ECONOMIC LOSS RULE DOES NOT BAR GYRODATA'S FRAUD CLAIMS .......... 26

1. The California Supreme Court holds that the economic loss rule does not apply to fraud cases .......... 26

2. Defendants' fraud endangered public health, safety and welfare .......... 28

3. The BAE Defendants cannot have their cake and eat it too .......... 29

VI. DEFENDANTS' ISSUE SIX: GYRODATA CANNOT MAINTAIN A CLAIM FOR FRAUDULENT INDUCEMENT .......... 29

PLAINTIFF'S RESPONSE: GYRODATA RELIED ON FALSE PROMISES IN RE-ORDERING T100S .......... 30

VII. BAE DEFENDANTS' ISSUE SEVEN: PLAINTIFF'S FRAUD CLAIM AND TORTIOUS INTERFERENCE CLAIMS ARE TIME BARRED .......... 31

1. Gyrodata Knew before December 1, 2005 of T100 Manufacturing Transfer and Delays: .......... 32

2. Gyrodata Knew Before December 1, 2005 of T70 Development Problems .......... 32

3. Gyrodata Knew Before December 1, 2005 of Westlake Closure: .......... 33

PLAINTIFF'S RESPONSE: GYRODATA'S FRAUD AND INTERFERENCE CLAIMS ARE TIMELY .......... 34

1. Fraud occurring after December 2005 and contractual interference occurring after December 2006 are admittedly timely .......... 34

2. Gyrodata filed suit within three years of discovering fraud and two years of discovering tortious interference .......... 35

(a) Westlake closure .......... 35

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

(b) Transfer of production to Cheshire ....................................35

(c) Original T70 design/August 2005 presentation. ................36

3. The Defendants are estopped from claiming limitations..............36

4. What matters is when continuing conduct *ends*, not when it begins .......................................................................................37

VIII. BAE DEFENDANTS' ISSUE EIGHT: PLAINTIFF'S FRAUD CLAIM AGAINST THE BAE DEFENDANTS IS BARRED .....................................37

PLAINTIFF'S RESPONSE: EACH NAMED BAE DEFENDANT IS LIABLE FOR FRAUDULENT ACTS AND OMISSIONS.............................39

IX. BAE DEFENDANTS' ISSUE NINE: PLAINTIFF FAILS TO ESTABLISH KEY ELEMENTS REQUIRED FOR TORTIOUS INTERFERENCE CLAIMS .......................................................................41

PLAINTIFF'S RESPONSE: BAE'S INTERFERENCE WAS INTENTIONAL AND NOT PRIVILEGED....................................................43

PLAINTIFF GYRODATA'S MOTIONS FOR SUMMARY JUDGMENT..............44

I. PLAINTIFF'S ISSUE A: BAE/AIS'S "STANDARD TERMS AND CONDITIONS" ARE NOT PART OF THE T-100 SALES CONTRACTS OR T-100 REPAIR-PARTS CONTRACT .............................45

DEFENDANTS' RESPONSE: DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON WHETHER THE ST&CS ARE PART OF THE T100 CONTRACT ..........................................48

II. PLAINTIFF'S ISSUE B: NO "SEPARATE AGREEMENT" PROHIBITS GYRODATA FROM REPAIRING OR MODIFYING T-100S ....................................................................................................49

DEFENDANTS' RESPONSE: THREE OTHER CONTRACTS CONSTRAIN PLAINTIFF'S ABILITY TO MODIFY T100S .......................50

III. PLAINTIFF'S ISSUE C: GYRODATA CANNOT BE SUED FOR USING INTELLECTUAL PROPERTY IT OWNED.....................................51

1. The "Proprietary Information" Gyrodata allegedly used was created during the T70 design effort...........................................51

2. Gyrodata owned rights to the T70 program data, including the brazed flexure design ..........................................................51

DEFENDANTS' RESPONSE: GYRODATA NEVER OBTAINED RIGHTS TO T70 IP ........................................................................................53

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

IV. PLAINTIFF'S ISSUE D: EVEN IF "SELLER'S TERMS AND CONDITIONS" APPLIED, THEY DO NOT LIMIT GYRODATA'S RIGHT TO REPAIR, REPLACE OR MODIFY THE T-100 .......................... 54

DEFENDANTS' RESPONSE: THE ST&CS LIMIT GYRODATA'S RIGHT TO REPAIR OR MODIFY T100S .................................................... 55

V. PLAINTIFF'S ISSUE E: AIS WAIVED ITS COUNTERCLAIM AND OFFSET DEFENSES BY SELLING GYRODATA REPAIR PARTS ........... 56

DEFENDANTS' RESPONSE ..................................................................... 58

1. There Is No Waiver of the Counterclaim ..................................... 58

2. Factual Issues Regarding Plaintiff's Unclean Hands .................... 59

PLAINTIFF'S FURTHER RESPONSE: VIOLATION OF PAGE LIMITS AND BRIEFING AGREEMENTS…………………………………………...61

RESPONSE TO GYRODATA'S MOTION TO STRIKE……………………61

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*2156 Stratford Circle LLC v. AIG, Inc., et al*, 2012 WL 29411 ....38

*Aas v. Superior Ct.*, 24 Cal.4th 627 (2000) ....25

*Alliance Mortg. Co. v. Rothwell*, 10 Cal.4th 1226 (1995) ....29

*Allied Fire & Safety Equipment Co., Inc. v. Dick Enterprises, Inc.*, 972 F. Supp. 922 (E.D. Pa. 1997) ....38

*Alvarado Orthopedic Research, L.P. v. Linvatec Corp.*, No. 11-CV-246 IEG, 2011 WL 3703192 (S.D. Cal. Aug. 23, 2011) ....21, 22

*Annett Holdings, Inc. v. Kum & Go, L.C.*, 801 N.W.2d 499 (Iowa 2011) ....38

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503 (1994) ....1, 3, 23

*Asset Mktg. Systems, Inc. v. Gagnon*, 542 F.3d 748 (9th Cir. 2008) ....52

*Babul v. Golden Fuel, Inc.*, 990 So. 2d 680 (Fl. Ct. App. 2008) ....14

*Bank of New York v. Fremont Gen. Corp.*, 523 F.3d 902 (9th Cir. 2008) ....43

*Baron Fin. Corp. v. Natanzon*, 509 F. Supp. 2d 501 (D. Md. 2007) ....6

*Benis v. Sallie Mae, Inc.*, No. CV 11-00402-ODW ....28

*Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609 (2d Cir. 1979) (Friendly, J.) ....5

*Cardinal Health 301, Inc. v. Tyco Elecs. Corp.*, 169 Cal. App. 4th 116 (Cal. App. 2008). Notice ....18

*Christ v. Beneficial Corp.*, 547 F.3d 1292 (11th Cir. 2008) ....54

*Christ v. Beneficial Corp.*, 547 F.3d 1292 (11th Cir. 2008) ....55

*Cities Service Helex, Inc. v. United States*, 543 F.2d 1306 (Ct. Cl. 1976) .......... 17, 18

*Civic Center Drive Apartments Ltd. P'ship. v. Sw. Bell Video Servs.*, 295 F. Supp. 2d 1091 (N.D. Cal. 2003) .......... 7

*Claredi Corp. v. SeeBeyond Tech. Corp.*, No. 4:04CV1304 RWS, 2010 WL 1257946 (E.D. Mo. Mar. 26, 2010) .......... 6

*Copeland v Baskin Robbins USA*, 96 Cal.App.4th 1251 (2002) .......... 3, 4

*County of Santa Clara v. Atl. Richfield Co.*, 137 Cal.App.4th 292 (2006) .......... 24

*Craig Wireless Sys. Ltd. v. Clearwire Legacy LLC*, 2011 WL 4011415 (W.D. Wash. 2011) .......... 49

*Culcal Stylco, Inc. v. Vornado, Inc.*, 26 Cal. App. 3d 879 (1972) .......... 43

*Dafasso v. Gen. Dynamics C4 Systems, Inc.*, 637 F.3d 1047 (9th Cir. 2011) .......... 39

*Dawson v. Toledano*, 109 Cal. App. 4th 387 (2003) .......... 11

*Deposit Ins. Corp. v. Corelogic Valuation Services, LLC*, 2011 WL 5554324 (C.D. Cal. 2011) .......... 38

*Diamond Fruit Growers, Inc. v. Krack Corp.*, 794 F.2d 1440 (9th Cir. 1986) .......... 46, 47

*Eagle Precision Tech., Inc. v. Eaton Leonard Robolix, Inc.*, 2006 WL 6544087 .......... 31

*Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957 (5th Cir. 1976) .......... 16, 17

*Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 973 (5th Cir. 1976) .......... 19

*Eforce Global, Inc. v. Bank of America, N.A.*, 2010 WL 2573976 .......... 42

*Engalla v. Permanente Med. Group, Inc.*, 15 Cal. 4th 951 (Cal. 1997) .......... 31

*Erlich v. Menezes*, 21 Cal. 4th 543 (1999) ("*Erlich*") .......... 26, 27

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

*Federal Deposit Ins. Co. v. LSI Appraisal, LLC*, 2011 WL 5223061 (C.D. Cal. Nov. 2, 2011) ....38

*Flowers v. Carville*, 310 F.3d 1118 (9th Cir. 2002) ....37

*Ganley v. Cnty. of San Mateo*, No. C06-3923 TEH, 2007 WL 4554318 (N.D. Cal. Dec. 20, 2007) ....56

*Garter-Bare Co. v. Munsingwear Inc.*, 723 F.2d 707 (9th Cir. 1984) ....36

*Great American Ins. Co. of N.Y. v. Vegas Constr. Co., Inc.*, 251 F.R.D. 534 (D. Nev. 2008) ....50

*Hannibal Pictures, Inc. v. Sonja Productions LLC*, 432 Fed. App'x. 700 (9th Cir. 2011) ....27

*Hartung v. Pollastrini*, 147 Cal. App. 2d 88 (Cal. App. 1956) ....20

*Heheman v. E.W. Scripps Co.*, 661 F.2d 1115, rehearing denied 668 F.2d 878 ....42

*Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910 (9th Cir. 2001) ....11

*Hynix Semiconductor Inc. v. Rambus Inc.*, 441 F. Supp. 2d 1066 (N.D. Cal. 2006) ....40

*In re Acosta*, 182 B.R. 561 (N.D. Cal. 1994) ....56

*In re Tobacco II Cases*, 46 Cal.4th 298 (2009) ....30

*Intelligraphics, Inc. v. Marvell Semiconductor, Inc.*, No. C07-02499 JCS, 2009 WL 330259 (N.D. Cal. Feb. 10, 2009) ....21, 22, 23, 25, 26

*Inter Mountain Mortg., Inc. v. Sulimen*, 78 Cal. App. 4th 1434 (2000) ....40

*Jacobs v. Tenneco West, Inc.*, 186 Cal. App. 3d 1413 (5th Dist. 1986) ....52

*Jimenez v. Superior Court*, 29 Cal.4th 473 (2002) ....22

*K & M Joint Venture v. Smith Int'l., Inc.*, 669 F.2d 1106 (6th Cir. 1982) ....17

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOSANGELES, CALIFORNIA 90071

*K & M Joint Venture v. Smith Int'l, Inc.*, 669 F.2d 1106 (6th Cir. 1982)....................................19

*Kauffman v. Manchester Tank & Equip. Co.*, 203 F.3d 831, D.C. No. CV-96-05060-FDB, 1999 WL 1103357 (9th Cir. Dec. 3, 1999)......10

*KB Home v. Superior Court*, 112 Cal.App.4th 1076 (2003)....................................25

*Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262 (9th Cir. 1991)....................................52

*Kern Oil & Refining Co. v. Tenneco Oil Co.*, 840 F.2d 730 (9th Cir. 1988)....................................18

*Kerry, Inc. v. Lakeland Cold Storage, LLLP*, No. 8:10-cv-2209-T-27MAP, 2011 WL 2038549 (M.D. Fla. May 24, 2011)........................45

*Kline v. Turner*, 87 Cal. App. 4th 1369 (2001)....................................31

*Langdon v. Langdon*, 47 Cal. App. 2d 28 (Cal. App. 1941)....................................36

*Legal Additions LLC v. Kowalski*, No. C-08-2754 EMC, 2010 WL 1999894 (N.D. Cal. May 18, 2010)........................14, 29, 38

*Lewis Jorge Const. Mgmt., Inc. v. Pomona Unified School Dist.*, 34 Cal.4th 960 (2004)....................................1, 3

*LucasArts Entm't Co. v. Humongous Entm't Co.*, 870 F. Supp. 285 (N.D. Cal. 1993)....................................42

*Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932 (9th Cir. 1999)....................................6, 9

*McDonald v. John P. Scripps Newspaper*, 210 Cal.App.3d 100 (1989)....................................7

*McKenzie v. Alla-Ohio Coals, Inc.*, 1979 WL 30087 (D.D.C. 1979)....................................49

*Merritt-Campbell Inc. v. RxP Products, Inc.*, No. 3:96-CV-1396-AH, 1997 WL 376048 (N.D. Tex., June 30, 1997)..................................2

*Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703 (9th Cir. 1990)....................................6

*Mills v. Forestex Co.*, 108 Cal. App. 4th 625 (Cal. App. 2003)....................................36

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

*Morey v. Vannucci*,
64 Cal. App. 4th 904 (1998) ....................................................................................14

*Moser v. Triarc Co., Inc.*,
No. 05cv1742-LAB ..........................................................................................................35

*Multifamily Captive Group LLC v. Assurance Risk Managers, Inc.*,
629 F.Supp.2d 1135 (E.D. Cal. 2009) ..........................................................21, 22, 23, 25, 26

*Nat'l Data Payment Sys., Inc. v. Meridian Bank*,
212 F.3d 849 (3rd Cir. 2000)..................................................................................................8

*Netbula, LLC v. BindView Dev. Corp.*,
516 F. Supp.2d 1137 (N.D. Cal. 2007)...................................................................................25

*Netbula, LLC v. BindView Dev. Corp.*, 516 F.Supp.2d 1137 (N.D. Cal. 2007). The..................38

*Nielsen v. Trofholz Techs., Inc.*,
750 F. Supp. 2d 1157 (E.D. Cal. 2010), *aff'd*, 2012 WL 689948 (9th Cir. Mar. 5, 2012)........4

*Northern Natural Gas Co. v. Superior Court*,
64 Cal.App.3d 983, 134 Cal.Rptr. 850 (Cal. App. 1976) ........................................................38

*OBE Ins. Corp. v. Jorda Enterprises, Inc.*,
*277 F.R.D. 676 (S.D. Fla. 2012)* .........................................................................................39

*Opto Generic Devices, Inc. v. Air Products & Chemicals, Inc.*,
2010 WL 454986 (N.D.N.Y. 2010)..........................................................................................3

*Oracle USA, Inc. v. XL Global Services*,
No. C09-00537 MHP, 2009 WL 2084154 (N.D. Cal. July 13, 2009)..................22, 23, 25, 26

*Phil Crowley Steel Corp. v. Sharon Steel Corp.*,
782 F.2d 781 (8th Cir. 1986) ..................................................................................................44

*Plastic Moldings Corp. v. Park Sherman Co.*,
606 F.2d 117 (6th Cir. 1979) ..................................................................................................20

*Pollard v. Saxe & Yolles Dev'l Co.*,
12 Cal.3d 374..........................................................................................................................17

*Quelimane Co. v. Stewart Title Guar. Co.*,
19 Cal. 4th 26 (1998)..............................................................................................................43

*Rachford v. Airline Pilots Association*,
2006 WL 1699578 ..................................................................................................................12

*Robinson Helicopter Co. v. Dana Corp.*,
34 Cal.4th 979 (2004)..................................................................................21, 22, 24, 25

*Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979 (2004) ("*Robinson*")...........................26

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOSANGELES, CALIFORNIA 90071

*Rodriguez v. Airborne Express*,
265 F.3d 890 (9th Cir.2001) .....32

*S.F. Unified School Dist. v. W.R. Grace & Co.*,
37 Cal.App.4th 1318 (1995) .....24

*Samica Enterprises, LLC v. Mail Boxes Etc. USA, Inc.*,
637 F.Supp.2d 712 (C.D. Cal. 2008) .....7, 8

*Sicor Limited v. Cetus Corp.*,
51 F.3d 848 (9th Cir. 1995) .....12

*Silver v. Goldman Sachs Group, Inc.*,
No. CV 10-4961 RSWL .....28

*Silvera v. Broadway Dep't Store, Inc.*,
35 F.Supp.625 (S.D. Cal. 1940) (7-1/2 months is not reasonable).....17

*State v. Bowen*,
710 F. Supp. 739 (E.D. Cal. 1989) .....49

*Stearns v. Select Comfort Retail Corp.*,
763 F. Supp. 2d 1128 (N.D. Cal. 2010).....18

*Surfco Haw. v. Fin Control Sys. Pty, Ltd.*,
264 F.3d 1062 (Fed. Cir. 2001) .....54, 57

*Surfco Haw. v. Fin. Control Sys. Pty, Ltd.*, 264 F. 3d 1062 (Fed Cir. 2001).....56

*T.J. Stevenson & Co., Inc. v. 81,193 Bags of Flour*,
629 F.2d 338 (5th Cir. 1980) .....18

*Taylor v. U.S.*,
821 F.2d 1428 (9th Cir. 1987), cert denied, 485 U.S. 992 .....49

*Textile Unlimited, Inc. v. A..BMH & Co.*,
240 F.3d 781 (9th Cir. 2001) .....46, 47

*Tiberi v. CIGNA Corp.*,
89 F.3d 1423 (10th Cir. 1996) .....37

*Tok Cha Kim v. CB Richard Ellis Hawaii, Inc.*,
2008 WL 2610274 .....38

*Transwestern Pipeline Co. v. Monsanto Co.*,
46 Cal. App. 4th 502 (Cal. App. 1996).....46, 47

*Twin Disc, Inc. v. Big Bud Tractor, Inc.*,
772 F.2d 1329 (7th Cir. 1985) .....49

*U.S. ex rel Thomas v. Siemens AG*, 708 F. Supp. 2d 505 (E.D.Pa. 2010) ....................38

*United Guar. Mortg. Indem. Co. v. Countrywide Financial Corp.*, 660 F. Supp. 2d 1163, 1183 (C.D. Cal. 2009) ....................28

*United Guar. Mortgage Indem. Co. v. Countrywide Fin. Corp.*, 660 F.Supp.2d 1163 (C.D. Cal. 2009) ....................21, 23, 25, 26, 29

*United States v. Bakshinian*, 65 F. Supp. 2d 1104 (C.D. Cal. 1999) ....................10

*United States v. King Features Entm't, Inc.*, 843 F.2d 394 (9th Cir. 1988) ....................2

*United States v. Southern Contracting of Charleston, Inc.*, 862 F. Supp. 107 (D.S.C. 1994) ....................19

*United States v. Various Slot Machines on Guam*, 658 F.2d 697 (9th Cir. 1981) ....................8

*Vaca v. Wachovia Mortgage Corp.*, 198 Cal. App. 4th 737 (2011) ....................33

*Wells Fargo Bank, N.A. v. LaSalle Nat'l Bank. Assn.*, No. 2:08-CV-1448 JCM (RJJ), 2011 WL 6300948 (D. Nev. Dec. 15, 2011) (FED. R. EVID. 801(d)(2) applicable to former employees) ....................10

*Western Emulsions, Inc. v. BASF Corp.*, No. CV 05-5246 CBM ....................28

*Woods v. Fox Broad. Sub., Inc.*, 129 Cal. App. 4th 344 (2005) ....................43, 44

*Wynn v. Nat'l Broadcasting Co., Inc.*, 234 F. Supp. 2d 1067 (C.D. Cal. 2002) ....................42

*Yount v. Acuff Rose-Opryland*, 103 F.3d 830 (9th Cir. 1996) ....................2

## RULES

FED. R. CIV. P. 8(c)(1) ....................45

FED. R. CIV. P. 8(d) ....................15

FED. R. CIV. P 9(b) ....................34

FED. R. CIV. P 26 ....................26

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOSANGELES, CALIFORNIA 90071

FED. R. CIV. P. 37(d) .... 50, 51

FED. R. EVID. 408 .... 15

FED. R. EVID. 602 .... 49

FED. R. EVID. 801(d)(2)(A) .... 15

FED. R. EVID. 1006 .... 15

## STATUTES

CAL. CIV. CODE § 1572-73, 1709-10 .... 27, 40

CAL. CIV. CODE § 1574 .... 40

CAL CIV. CODE § 1654 .... 14

CAL. CIV. CODE §§ 2299-2300 .... 40

CAL. CIV CODE § 3301 .... 8

CAL. CODE CIV. PROC §338(b) .... 31

CAL. CODE CIV. PROC. § 338(d) .... 35

CAL. CODE CIV. PROC § 339 .... 31

CAL. CODE CIV. PROC § 1856 .... 12

CAL. COMM. CODE § 1308 cmt. 2 .... 20

CAL. COMM. CODE § 2202(a) .... 12

CAL. COMM. CODE § 2207 .... 46

CAL. COMM. CODE 2-207(1) .... 48

CAL. COMM. CODE § 2207(3) .... 48

CAL. COMM. CODE §§ 2314, 2315 .... 47

CAL. COMM. CODE § 2607(2) .... 20

CAL. COMM. CODE § 2607(3)(A) .... 16

CAL. COMM. CODE § 2612 .... 16

CAL. COMM. CODE § 2612(3) .... 17

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOSANGELES, CALIFORNIA 90071

CAL. COMM. CODE §§ 2714, 2715 ....................27

## OTHER AUTHORITIES

Masterson, Baron & LaMothe, CALIFORNIA CIVIL PRACTICE BUSINESS LITIGATION, § 40:63 ....................18

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOSANGELES, CALIFORNIA 90071

**DEFENDANTS' MOTION**

**I. DEFENDANTS' ISSUE ONE: RECOVERY OF CONSEQUENTIAL DAMAGES FOR BREACH OF THE T70 CONTRACT IS BARRED BECAUSE THERE IS NO JUSTIFIABLE EXPECTATION OF SUCH DAMAGES**

1. Introduction

In 2003, Gyrodata and AIS[1] -- two sophisticated companies -- entered into a contract (the "T70 contract") for Gyrodata to pay up to $1 million in exchange for AIS's engineering services to employ best efforts to develop a prototype for a new gyroscope with a size, strength and accuracy never before seen in combination. D1,D2; EA308, p.6148-51.[2] The T70 contract identified "goals" for the "Program," and thus the work was to be done on a "best efforts basis" because the goals "may not be achieved." D3,D4; EA 308, p.6149. The parties expressly stated that the development work "will be done . . . with **no guaranty as to the results or the success of the program.**" D5; EA 308, p.6149 (emphasis added).

Despite this language, Gyrodata seeks damages exceeding $53 million for profits it expected to make had a T70 gyroscope been developed successfully back in 2006. D6; EA 367, p.6942. It is well settled, however, that "consequential damages beyond the expectation of the parties are not recoverable." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 515 (1994). Lost profits suffered from secondary transactions such as the resale of a good are only recoverable where it is "obvious" the parties contemplated them. *Lewis Jorge Const. Mgmt., Inc. v. Pomona Unified School Dist.*, 34 Cal.4th 960, 972 (2004).

When the T70 contract unambiguously states that the "results" or "success" of the best efforts development program -- the goals of which "may not be achieved" -- are not guaranteed, it cannot be "expected" or "obvious" the parties contemplated lost

[1]AIS is the successor to BAE Systems Inertial Products Inc. ("BAE Inertial"), which originally performed the contract. D44. To avoid confusion with the BAE Defendants, AIS will be used to refer to the party responsible to perform the contract.

[2]"P__" and "D__" refer to Plaintiff's Facts and Defendants' Facts in the Joint Statement of Uncontroverted Facts. "EA" refers to the Joint Evidence Appendix, followed by the exhibit and page number in the EA.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOSANGELES, CALIFORNIA 90071

profits to be recoverable. The opposite is true: consequential damages cannot be within Gyrodata's justifiable "expectation" when it expressly agreed to the contrary!

2. The Contract is Clear and Unambiguous

"Summary judgment is appropriate when the contract terms are clear and unambiguous, even if the parties disagree as to their meaning." *United States v. King Features Entm't, Inc.*, 843 F.2d 394, 398 (9th Cir. 1988).[3] The T70 contract is clear that the parties' expectation, at the time the contract was made, was that the result of the development program was uncertain. The parties agreed *not* to have commercial expectations based on the development of the T70: "[a]ll . . . work performed will be done on a best efforts basis with *no guaranty as to the results or the success of the program,*" D5; EA 308, p.6149 (emphasis added), and *"[l]ack of goal achievement* will not affect any milestone payment . . . . Payment will be made in full for each milestone upon completion *regardless of its outcome*." D7-D8; EA 308, p.6149 (emphasis added).

These terms are clear. The T70 development contract sought to meet Gyrodata's targeted specifications, but the outcome was agreed to be uncertain. What distinguishes other best efforts contract cases is that the T70 contract includes express language to *disavow* the parties' expectations of future success, thereby precluding any understanding acknowledging the potential recovery of hoped-for profits in the event of failure.[4]*See Merritt-Campbell Inc. v. RxP Products, Inc.*, No. 3:96-CV-1396-AH, 1997 WL 376048, at *3 & n.5 (N.D. Tex., June 30, 1997) (granting summary judgment because hopes do not equate to a reasonable certainty required to award lost

[3]"When a contract has been reduced to writing, a court must ascertain the parties' intent from the writing alone, if possible." *Yount v. Acuff Rose-Opryland*, 103 F.3d 830, 836 (9th Cir. 1996).

[4]None of the cases cited by Gyrodata showing lost profits damages on a best efforts contract involve a contract expressly disclaiming any guarantee of success. *See*, Gyrodata Opp., p.6; *Marsu*, 185 F.3d 932 (9th Cir. 1999) (production of 13 films required, then best efforts to promote); *Milgard*, 902 F.2d 703 (9th Cir. 1990) (not a best efforts contract; results guaranteed); *Claredi*, 2010 WL 1257946 (E.D. Mo.) (best efforts to sell an existing product).

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

profits). Saying "no guaranty of results" is simply a non-lawyer's way of saying "no expectation of consequential damages."

3. The T70 Contract Precludes Lost Profits Damages

Contract damages are limited to those within the contemplation of the parties when the contract was entered into or at least foreseeable by them at that time; consequential damages beyond the expectation of the parties are not recoverable. *Lewis Jorge*, 34 Cal.4th at 969. "This limitation on available damages serves to encourage contractual relations and commercial activity by enabling parties to *estimate in advance* the financial risks of the enterprise. . . . [I]t is appropriate to enforce only such obligations as each party *voluntarily assumed*, and to give him only such benefits as he *expected* to receive; this is the function of contract law." *Litton*, 7 Cal.4th at 515, 517 (emphasis added).

The T70 contract confirms the commercial expectations of the parties. The parties did not "estimate in advance," nor did Defendants "voluntarily assume," the risk of responsibility for Gyrodata's hoped-for $53 million in profits. Nor did Gyrodata contract for the corresponding benefit, i.e., to receive such profits in the event of failure. No reasonable person could read the T70 contract and conclude that Defendants expected to "voluntarily assume" the financial risk of mega-millions of damages in the event it did not successfully develop this nonexistent T70 gyroscope.[5]

This agreement to use best efforts, with explicit language of no guarantee of success, is analogous to an agreement to negotiate a contract; the proper inquiry is not whether the hoped-for outcome was obtained, but whether the attempt was made in good faith. Such agreements to negotiate are enforceable, *Copeland v Baskin*

[5] Another problem with Gyrodata's T70 damages claim is that the T70 contract was a *development* contract, not a *manufacturing* contract. Contracts for development of a new product (such as the T70) do not anticipate lost profits. *See, e.g., Opto Generic Devices, Inc. v. Air Products & Chemicals, Inc.*, 2010 WL 454986 at *4 (N.D.N.Y. 2010). The contract provides that AIS was not required to manufacture the T70 gyros; it contains only an option to manufacture if the development program was successful. D9, EA 308, p.6149. Plaintiff's expert, John Casparro, who wrote the T70 contract, conceded that there was no production obligation under the contract. Casparro Tr., 12/19/11, 195:1-9, 224:25-225:12, 231:16-19.

*Robbins USA*, 96 Cal.App.4th 1251 (2002), but plaintiff is limited, as a matter of law, to out-of-pocket damages. "The plaintiff cannot recover for lost expectations (profits) because there is no way of knowing what the ultimate terms of the agreement would have been or even if there would have been an ultimate agreement." *Id*. at 1262-63. The same is true for the T70 contract. The parties agreed to use best efforts, but further agreed not to assume best efforts will lead to a viable result. Damages are properly limited to out-of-pocket costs (e.g., the payment for AIS's engineering services).

Here, disclaimer of expectations is written into the contract. Consequential damages were expressly not an expected benefit of the T70 contractual bargain.

**PLAINTIFF'S RESPONSE: GYRODATA'S LOST PROFITS WERE FORESEEABLE AND RECOVERABLE**

The "best efforts/no guarantee" provisions of the T70 contract shield Defendants from the inherent challenges of aerospace engineering, not from their own incompetence, laziness and dishonesty.

1. Gyrodata's profits not only were foreseeable but were foreseen

Lost profit damages are foreseeable when the obligor is "'advised of the facts concerning special harm which might result' from breach …." *Lewis Jorge*, 34 Cal. 4th at 969. All knew that the sole purpose of the T70 contract was to produce an improved gyroscope for use in profit-generating services. Uttecht Decl., ¶ 40 (EA 11, p. 874).[6] The $9.5 million worth of T70s to be sold to Gyrodata under the contract would be placed into tools, each of which would produce hundreds of thousands to millions of dollars in revenue. *Id*., ¶ 8 (EA 11, pp. 860-61). John Casparro authored the T70 contract for BAE and testified that because Gyrodata's and BAE's

[6] Objections to a declaration filed in opposition to a motion for summary judgment "must be precise" and must "specify which parts of the … [declaration] should be stricken and why." *Nielsen v. Trofholz Techs., Inc.*, 750 F. Supp. 2d 1157, 1161 (E.D. Cal. 2010), *aff'd*, 2012 WL 689948 (9th Cir. Mar. 5, 2012). Defendants' unfocused and conclusory complaints fail to meet these strict requirements and should therefore be ignored.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

relationship was mature, BAE understood that (1) Gyrodata's tools used gyros to repeatedly lease to the oil and gas industry for profit, (2) the market for T70 was huge and (3) a shortage of gyroscopes or defective gyroscopes would lead to lost profits. Casparro Tr. (10/20/09), 20:1-25, 21:14–23:1, 29:3-12, (12/19/11) 299:5–301:12. Defendants' documents also show that they understood that Gyrodata: (1) earned $100 million annually by re-using the gyroscopes they purchased in a service business, (2) would create "huge savings" for its customers (up to $115,000 per well) by using the T70-based GWD tool and (3) would need approximately 3,700 T70s to capture 85% of the multi-billion measurement-while-drilling market with the T70. EA 2, pp. 119, 121, 123; EA 140, pp. 2623, 2622; EA 384, p. 7111 at item 1.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

2. <u>The T70 contract also anticipated profit</u>

A "best efforts" contract requires diligence, the absence of misfeasance or nonfeasance and the same vigor the obligor uses while pursuing its own like interests. *Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 612-15 (2d Cir. 1979) (Friendly, J.). The T70 contract was reviewed by the same BAE lawyers who wrote "no consequential damages" provisions into the failed ST&Cs, yet it contains no such language. Casparro Tr. (10/20/09), 162:3-18. Defendants mischaracterize the T70 contract as a $1-million[7] research project to accomplish the metamorphosis from "best efforts" into "no consequentials." The contract required *delivery* of three prototypes meeting 14 minimum requirements. EA 308, pp. 6149 at ¶ 2, 6148; EA 2, pp. 119. Only four of 18 T70 requirements were "design goals," and even those goals often stated minimum requirements. EA 308, p. 6148. BAE Systems told Gyrodata it would spend its own money to develop the T70 to create a gyro for the aerospace industry, and Gyrodata was acquiring exclusive wellbore rights for its $1 million share of funding. Uttecht Decl., ¶ 15 (EA 11, pp. 862-63); Klopp Decl., ¶ 7 (EA 8,

[7] Defendants juxtapose Gyrodata's $53 million of damages with its portion of the T70 budget. Gyrodata (and BAE) *expected* it could make millions of dollars with the T70; the actual damages from failure *happened* to be $53 million. The foreseeability standard is the same whether lost profits are $530,000 or $53 million.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

pp. 830-31). If the T70 exceeded its budget, BAE Systems was still obligated to produce the prototypes. Casparro Tr. (10/20/09), 32:8–33:13, 206:22–207:20; EA 405, pp. 7465-66. "Best efforts" meant the company would commit to the project regardless of short-term financial burden and do everything possible to ensure its success. Persico Tr. (10/21/09), 23:6-17; 22:19-23; Hoffman Tr. (11/11/09), 57:4-13. Unlike the contract in *Opto Generic Devices*, which contained "no indication whatsoever" that production was intended, the T70 contact contemplated production, leaving open only whether BAE or Gyrodata would produce it. 2010 WL 454986, at *4. Once the T70 was prototyped, BAE Systems would sell it "in quantities of 100 units," with the "first 1,000" units to be sold at a discounted price of "$9,000 to $9,500," and BAE estimated it would sell $19 million worth of T70s in the first four years of production — and thousands would be sold to Gyrodata. EA 2, pp. 123, 107; EA 308, p. 6150 at ¶¶ 6, 10. If BAE elected not to build the T70, Gyrodata could manufacture and use the sensor. EA 308, p. 6149 at ¶ 5. It would have done so and has manufactured other gyroscopes successfully in the past. Uttecht Decl., ¶¶ 15, 41, 44 (EA 11, pp. 862-63, 874-75, 876-77).

3. <u>Lost profits are routinely awarded in best efforts cases</u>

Whether written into their text or not, all best efforts contracts imply that despite best efforts, the obligor may not succeed. *Baron Fin. Corp. v. Natanzon*, 509 F. Supp. 2d 501, 510-11 (D. Md. 2007). Yet, lost profits are routinely awarded in best efforts contract cases. *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 936-38 (9th Cir. 1999) (failure to promote *Marsu* character); *Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 711 (9th Cir. 1990) (failed glass furnace development); *Claredi Corp. v. SeeBeyond Tech. Corp.*, No. 4:04CV1304 RWS, 2010 WL 1257946, at *5-6 (E.D. Mo. Mar. 26, 2010) (failure to market software; applying California law).

None of the authorities Defendants cite support the motion. *Lewis Jorge* does not set an obviousness *requirement*; it holds that in contracts such as the one at bar,

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOSANGELES, CALIFORNIA 90071

foreseeability of lost profit is an *obvious result*: "[t]he likelihood of lost profits from related or derivative transactions *is so obvious* in these situations that the breaching party must be deemed to have contemplated them at the inception of the contract." *Lewis Jorge Constr. Mgmt.*, 34 Cal. 4th at 972 (emphasis added). *Litton* is a "contort" case that never discusses or applies contract foreseeability standards. 7 Cal. 4th at 515. Defendants borrow from inapplicable Texas "new business" cases and the law of agreements to negotiate, when the parties here negotiated for and agreed upon a binding contract. It is nonsensical to claim that Gyrodata entered the contract expecting nothing in return; rather, "[it] is presumed that lost profits are the type of damages that are within the contemplation of the parties where the object of the contract is profit." *Civic Center Drive Apartments Ltd. P'ship. v. Sw. Bell Video Servs.*, 295 F. Supp. 2d 1091, 1109 (N.D. Cal. 2003). "Whether damages arising from a breach of contract were reasonably foreseeable is a question of fact." *Id.* at 1107. Ample facts show that it was foreseeable that if BAE was lazy, incompetent, or dishonest, Gyrodata could lose millions.

## II. DEFENDANTS' ISSUE TWO: CONSEQUENTIAL DAMAGES ON THE T70 CONTRACT AND FRAUD CLAIMS ARE BARRED BECAUSE PLAINTIFF CANNOT PROVE CAUSATION

It is axiomatic that a plaintiff can only recover damages that were caused by a defendant's conduct. *McDonald v. John P. Scripps Newspaper*, 210 Cal.App.3d 100, 104 (1989). "Damages which are speculative, remote, imaginary, contingent or merely possible cannot serve as a legal basis for recovery." *Id.* at 104.

To prove causation of consequential damages, Gyrodata must prove that had Defendants used best efforts, AIS would have successfully developed a T70 gyroscope built to the specification in Table 1 of the contract. *Samica Enterprises, LLC v. Mail Boxes Etc. USA, Inc.*, 637 F.Supp.2d 712, 718 (C.D. Cal. 2008). The T70 contract specifications, *inter alia*, describe a dual-rate gyroscope, i.e., capable of measuring angular displacement at two different rates: 50°/sec. ("low rate") and 300°/sec. ("high rate"). D10; EA308, p.6148. Gyrodata has tried to develop such a

dual rate gyroscope since 2008 but has not succeeded to date. D11; Brosnahan Tr. 4/28/10, 170:5-171:3. Gyrodata points to its 2010 "development" of the MXY gyroscope as evidence that "it can be done." But the MXY is not a dual-rate gyroscope; it undisputedly does not meet the T70 *high* rate specification, or even have a high rate capability. D12; Brosnahan Tr., 12/22/11, 230:11-21.[8] Gyrodata can offer no admissible evidence that any commercially available gyroscope (including the G7) exists that meets the T70 dual-rate specification. D13; EA 482, p.8451-52. Gyrodata's attempt to brush off the high-rate requirement should be rejected; the T70 contract is unambiguous in its requirement of dual-rate capability, and Gyrodata's repeated references to "*the* T70" and "*a* T70" throughout its pleadings is inconsistent with its belated theory (Gyrodata Opp., p.11) that the T70 contract requires multiple gyroscopes (rather than different versions of the same gyroscope).

Gyrodata has not presented any competent evidence that better efforts by AIS would have resulted in a dual-rate gyroscope that meets the T70 specifications. Gyrodata has not designated an expert on this topic. Cursory, naked opinions that the T70 is feasible do not suffice. *United States v. Various Slot Machines on Guam*, 658 F.2d 697, 700-01 (9th Cir. 1981) (expert opinions not based on specific facts insufficient to create issue for trial). Without such evidence of causation, summary judgment should be granted. *Samica,* 637 F. Supp.2d at 718 (granting summary judgment on best efforts contract because plaintiff did not offer evidence that better efforts would have produced different outcome); *see also, Nat'l Data Payment Sys., Inc. v. Meridian Bank*, 212 F.3d 849, 854 (3rd Cir. 2000); Cal. Civ Code § 3301. Gyrodata's fraud and tortious interference claims fail for the same reason.

**PLAINTIFF'S RESPONSE: DEFENDANTS' FAILURE TO USE BEST EFFORTS CAUSED LOSS**

[8]The MXY is also not a miniaturized T100 gyro, but a G-2000 gyro, something that Defendants could never have used for development purposes, because this gyro is owned by Litton/Northrop Grumman. D14, D15.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOSANGELES, CALIFORNIA 90071

Like the defendants in *Marsu*, BAE used abysmal or no efforts. Four former BAE employees conceded that the company did not use best efforts. Casparro Tr. (10/20/2009), 114:3–115:1, 89:2-23, 92:16-23, 94:10–95:2, 97:17–98:10, 98:19–99:9, 103:19–104:6, 105:6–106:18, 109:19–110:15, 113:4-20, 118:8–119:12, 120:8–123:8, 124:5-17, (12/19/11) 44:24–45:13, 54:3-9, 84:17–85:1, 145:22–146:6, 271:2-22; Golden Tr. (9/23/09), 252:16–254:14, (1/6/12) 50:1-5, 50:18–51:12, 52:22–53:17, 62:1-18, 70:4-11; Hoffman Tr. (11/11/09), 146:16-23, 147:11-17, 151:2-10, 154:24–155:9, (12/15/11) 230:20-25, 237:14-32, 285:1-23, 296:7-16, 297:4-15, 303:12-17; Persico Tr. (10/21/09), 33:18–40:20, 40:25–42:23, 45:12–46:14, 53:14–54:12, 55:2-14, 56:8-13, 70:1–71:1, 78:21–79:15, 81:18–83:11. From 2003 to 2005, BAE pursued a design that its own employees warned would fail. EA 11, pp. 997-1018; EA 11, pp. 1177-78. It did. EA 11, p. 998. The project was incompetently managed, engineers were diverted, only one-third to one-half of budgeted time was spent on the project and it often languished on the shelf for months. EA 11, pp. 1192-1205; EA 11, p. 1242; Persico Tr. (10/21/09), 37:12–40:20. Every engineer originally assigned to the project was terminated due to "corporate restructuring," which Defendants confessed would keep them from finishing the T70. EA 2, pp. 603-04; EA 11, pp. 1150-71. Instead of admitting the fact, the T70 project was "transitioned" to a Cheshire group that Defendants knew could not do the work and was itself set to be gutted. EA 11, pp. 1212-39; EA 11, pp. 1240-57; EA 11, pp. 1270-72. There, the work received "low" or "no" priority; workers conceded that the company was "keeping secrets" that would "bite us in the buttocks" and "at this rate we will never have a T70." EA 11, pp. 1258-69; EA 11, pp. 1273-1301. When asked to assemble proof of "best efforts" in 2006, the T70 program manager responded that the timeline was "very ugly" and withheld it from Gyrodata. EA 407, pp. 7497-504; EA 408, p. 7506; EA 409, pp. 7508-09 Four and one-half years and five program managers into the development, Defendants were only 29% complete. McDonough Tr. (1/20/12), 104:19–106:20. Unabashed, in 2008, Defendants asked for $2 million more in

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

funding while privately conceding that they lacked the "bandwidth" to do the job. Uttecht Decl., ¶ 69 (EA 11, p. 892); EA 11, p. 1327.

Ample evidence shows Defendants would have finished the T70 had they used best efforts. Casparro Tr. (10/20/2009), 115:25–116:24, 169:24–170:8; Hoffman Tr. (11/11/09), 155:11-19, (12/15/11) 311:13–313:11; Persico Tr. (10/21/09), 83:12–84:14; Kohler Tr. (4/8/10), 9:15-21, 161:24–168:17; EA 370, pp. 7022-35; Uttecht Decl., ¶¶ 38-39, 41 (EA 11, pp. 873-74, 874-75). BAE assured itself that the T70 was doable before signing the contract and later assured Gyrodata of the same. Casparro Tr. (10/20/09), 37:2–38:7, 44:15–45:6; EA 11, pp. 1100-08. BAE's former employees have over 165 years of gyro engineering and development experience and relied on articulated facts, including Condor's long history of successful engineering development, its track record in other, more complex projects and a comparison of then-existing gyroscopes to the T70. Casparro Tr. (10/20/2009), 9:6–12:13, 115:4-24, (12/19/11) 37:25–43:12, 218:2-23, 37:3-14; Golden Tr. (9/23/09), 7:6–10:13, (1/6/12) 341:22–342:18; Hoffman Tr. (11/11/09), 56:24–57:10, (12/15/11) 220:10–223:1; Persico Tr. (10/21/09), 7:20–10:10, 21:21–23:17, (1/4/12) 281:17–282:18, 284:24–285:23, 311:10–313:21, 317:20–318:11. Another gyro, the Litton G-7, *had already* achieved T70 performance by the 1980s but was commercially unavailable. Hoffman Tr. (11/11/09), 62:6-25; Brosnahan Tr. (9/11/09), 30:4-13; Golden Decl., ¶ 21 (EA 6, p. 709); Uttecht Decl., ¶ 38 (EA 11, p. 873). Gyrodata met the T70 specification by developing an MXY gyro that has been used since September 2010 to earn millions in profit. Uttecht Decl., ¶ 41 (EA 11, pp. 874-75); Golden Decl., ¶¶ 22-23 (EA 6, pp. 709-10). An expert need not exhaustively detail the factual basis for his or her opinions in an affidavit opposing summary judgment. *Kauffman v. Manchester Tank & Equip. Co.*, 203 F.3d 831, D.C. No. CV-96-05060-FDB, 1999 WL 1103357, at *3 (9th Cir. Dec. 3, 1999). Even so, Gyrodata's expert, Mr. Kohler, did. In addition, such opinions are freely admissible when made by a party opponent. *United States v. Bakshinian*, 65 F. Supp. 2d 1104, 1109 (C.D. Cal. 1999); *Wells*

*Fargo Bank, N.A. v. LaSalle Nat'l Bank. Assn.*, No. 2:08-CV-1448 JCM (RJJ), 2011 WL 6300948, at *6 (D. Nev. Dec. 15, 2011) (FED. R. EVID. 801(d)(2) applicable to former employees). Historic success by product creators like Condor routinely supports lost profit awards. *Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001).

The T70 contract did not call for a combination high/low rate gyroscope; it called for a low rate, high accuracy model (used in the X/Y axis for wells of inclinations up to 70°), and a second high rate model (added to the low rate T70 for wells of 70 to 90° of inclination). EA 495, p. 8653; EA 447, pp. 7798-99; Golden Decl., ¶¶ 19-20 (EA 6, pp. 708-09); Uttecht Decl., ¶ 39 (EA 11, pp. 873-74); Hoffman Tr. (11/11/09), 36:7–37:6. Further, perfect accomplishment of the specifications was not required; any significant advance in the "low rate, high accuracy" model would have permitted Gyrodata to climb the inclination ladder, increase its market share, and make millions in profit. Uttecht Decl., ¶ 39 (EA 11, pp. 873-74); EA 365, pp. 6929-34. The "high rate" version of the T70 is now met by other available gyros in the market that Gyrodata couples with the MXY gyroscope to access the whole market. Uttecht Decl., ¶¶ 34-36 (EA 11, pp. 871-73); Golden Decl., ¶¶ 22-23 (EA 6, pp. 709-10). Gyrodata is now field testing such a highly accurate unit to reach the 70 to 90º market. *Id*. Causation is a fact question. *Dawson v. Toledano*, 109 Cal. App. 4th 387, 402 (2003). Defendants have merely located cases in which the plaintiffs had no proof. *See Samica*, 637 F. Supp. 2d at 717-18; *Meridian Bank*, 212 F.3d at 854.

## III. BAE DEFENDANTS' ISSUE THREE: THE CLAIM FOR BREACH OF THE T70 CONTRACT AGAINST BAE INC. IS BARRED

Although the T70 contract names "BAE Systems" "BAE Systems" is not the name of any incorporated legal entity and there are 17 other corporations beginning with these two words, besides the three BAE Defendants. (D24, EA2, pp. 10 fn.2, 46-49). Original drafts of the T70 contract referred to Condor Pacific Industries, Inc.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

("CPI"), not "BAE Systems.". (D27, 29-31, EA481, pp. 8403, 8406, EA175, pp. 3161-62, EA271, pp. 5294-5295, EA2, pp. 28, 633, 631-33). The same term -- "BAE Systems" -- was used in most other T100 purchase orders, but Gyrodata concedes that its T100 purchase orders were with BAE Systems Inertial Products, Inc. ("BAE Inertial," which is now called "AIS").[9]

Another contradiction in Count I is that the SAC ¶7 defines "BAE Systems, Inc." as "BAE Systems" and then proceeds, in Count I, to seek damages solely against AIS and "BAE Systems" (i.e. BAE Systems, Inc.) for breach of the T70 contract. (D16-19, EA481, pp. 8403, 8407, 8421). But the SAC attempts, in the alternative, to allege that each BAE Defendant also tortiously interfered with the T70 contract (SAC, Count V). These claims are contradictory and cannot both survive summary judgment.[10]

In addition, the T70 timeline, from negotiation, to contract formation, through performance, also shows that the only two parties to this contract were BAE Inertial and Gyrodata. *See* CAL. CIV. PROC. CODE § 1856; CAL. COM. CODE § 2202(a); *Sicor Limited v. Cetus Corp.*, 51 F.3d 848, 857 (9th Cir. 1995). The T70 contract was negotiated by CPI's former program manager for Gyrodata, John Casparro, first before CPI was bought and then was signed by CPI's former president, Ernie Smith, once CPI was renamed BAE Inertial. (D31-36, 42, EA2, pp. 9-11, 21, 24-28, 59). CPI/BAE Inertial was sold in 2007 and is now known as AIS. (D44, EA2, pp. 18, 633; EA339, p. 6294). Pursuant to BAE Inertial's invoices for T70 development, Gyrodata paid CPI/BAE Inertial, not any other BAE entity, for both T70 development

---

[9]Plaintiff should be judicially estopped from arguing that the BAE Defendants were parties to the T70 contract, because Plaintiff agrees that the T100 P.O.s were with BAE Inertial/AIS, not the BAE Defendants. (D48, EA481, p. 8413).

[10]*See Rachford v. Airline Pilots Ass'n*, 2006 WL 1699578, at *5-6 (N.D.Cal. 2006); *see also Litton*, 7 Cal.4th at 514. In Count I of the SAC, Plaintiff named only defendants AIS, and BAE Systems, Inc., (defined in SAC¶7 as "BAE Systems") and did not name defendants IESI and Controls. Plaintiff should thus be barred from now changing its theory to argue that all three BAE Defendants were parties to the T70 contract together with AIS.

and T100 deliveries. (D43, EA176, p. 3164, EA216-8, pp. 3392, 3396-9, EA515, p. 8921, EA513, pp. 8916-17). Gyrodata continued to deal with AIS (not any BAE Defendant) on T70 development and T100 deliveries after Inertial Products was sold. (D44-47, EA2, p. 18, EA211, p. 3371).[11] Plaintiff also sent to AIS proposed draft agreements regarding T70 development that *expressly* stated that its original 2003 T70 contract was with "BAE Systems Inertial Products Inc." (now AIS), and *not* with BAE Inc. (D47, EA340, p. 6297-6333).[12] Plaintiff offers no competent evidence to overcome these issues and cannot articulate any basis to hold *any* BAE Defendant contractually liable for what was clearly BAE Inertial/AIS' T70 contract. (*See also* Casparro 12/19/11 Tr., 9:7-10, 68:5-24, 180:14-183:11, 264:21-266:17, 187:8-19, Casparro 10/20/09 Tr., 30:19-22, 162:3-18 Persico 1/04/12 Tr., 69:6-70:12, Uttecht Tr. 12/23/11, 248:17-25, 257:9-261:17). Count I against the BAE Defendants should therefore be dismissed.

**PLAINTIFF'S RESPONSE: EACH BAE DEFENDANT IS LIABLE UNDER THE T70 CONTRACT**

The T70 contract refers to "BAE SYSTEMS" 21 times but does not define it. EA 308, pp. 6146-51; EA 79-80, pp. 1918, 1920; EA 176-77, pp. 3164-70. Not a single provision limits "BAE SYSTEMS" to BAE Inertial (Inertial is not mentioned by name at all). P198. BAE told Gyrodata during T70 contract negotiations that "BAE Systems" was a global company and the whole BAE organization would provide resources and support. Gyrodata understood the contract to apply to BAE Systems as a whole. Uttecht Decl., ¶ 45 (EA 11, p. 877); Klopp Decl., ¶¶ 7, 21 (EA 8, pp. 830-31, 835); EA 202, p. 3342.

Three plausible interpretations of "BAE SYSTEMS" exist: (1) BAE Systems, Inc., (2) BAE Systems Inertial Products, Inc. or (3) all named BAE Defendants (Inc.,

[11]Each BAE Defendant is a separate corporation, not affiliated with AIS and without any ownership interest in AIS. (See D20-26, D35, EA2, p. 31-40).

[12]Plaintiff's opposing argument that repair/manufacturing license negotiations are inadmissible under R. 408 lacks support.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

Controls, IESI and Inertial). Contemporaneous presentations on the Condor acquisition used "BAE SYSTEMS" to describe BAE Systems North America (now Inc.), the Controls Sector, IESI Sector and all 21,000 US employees. EA 17, pp. 1396-42. Use of the phrase "BAE SYSTEMS" is not surprising since BAE operated as a "single integrated company" without regard to corporate names and company policy defined "BAE SYSTEMS" to include the parent and all sectors, business units, and subsidiaries. Siegel Tr. (11/16/09), 23:13-15; 21:7–22:23; EA 150, p. 2953; EA 128, p. 2508 ("There is One BAE Systems …. 'BAE Systems Inc.' is that organization's *legal* (not communicative) name …. Our business name is … E&IS … Lines of business, including Platform Solutions … are administrative divisions …"); *see also* P208-P214.

Ernie Smith signed the T70 contract for "BAE Systems." EA 79-80, pp. 1918, 1920. Smith was part of the "BAE Systems North America Controls Sector." EA 17, p. 1400. HR records show that Smith and Casparro both worked for "BAE Systems-PSS-CPI" (short for Platform Solutions Sector). EA 151, p. 2966; EA 497, p. 8659; EA 151, p. 2961. "Platform Solutions" was part of Controls and reported to BAE Systems, Inc. Demars Tr. (11/4/09), 36:16-18; Siegel Tr. (11/16/09), 20:4–23:19. Casparro, who wrote the contract, testified the T70 contract was *not* limited to a single BAE entity; it applied to the BAE Systems "group that bought Condor." Casparro Tr. (12/19/11), 63:1–64:12; 215:15-18, 254:25–255:4. There is conflicting evidence as to whether Condor was acquired by BAE Systems North America (now Inc.) or BAE Systems Aerospace, Inc. (now IESI). EA 88, p. 2053; P201; *see also* Plaintiff's Resp. to D35-36.

Ambiguity as to contract terms and identity of parties presents a fact question for the jury. *Cf. Morey v. Vannucci*, 64 Cal. App. 4th 904, 914 (1998) (fact question where contract did not define "affiliated entities"); *Babul v. Golden Fuel, Inc.*, 990 So. 2d 680, 683-84 (Fl. Ct. App. 2008) (summary judgment reversed where contract used business name but did not specify legal entity); CAL CIV. CODE § 1654

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

(uncertainty resolved against contract drafter — here BAE). Given the ambiguity, Gyrodata understandably pled in the alternative. FED. R. CIV. P. 8(d). If the jury finds all BAE defendants are parties, there will be no need to submit an interference claim. For any non-contracting parties, interference applies.

There is conflicting evidence on course of performance.[13] Gyrodata was told that multiple BAE entities, sites and personnel were working on the T70 project. Uttecht Decl., ¶¶ 45, 58 (EA 11, pp. 877, 883-84); Klopp Decl., ¶¶ 21, 38 (EA 8, pp. 835, 840). Over a dozen employees involved in T70 (Smith, Casparro, Siegel, Marinello, Kanner, White, Cox, Demmons, Gwyn, McDonough, Anderson, Persico, Arlievsky, Vikjaer, Thaisz, and Melnyk)[14] worked for entities other than Inertial Products, Inc. *See* Esparza Decl., Ex. A, Tabs 1-16.[15] (EA 502, pp. 8670-6). Numerous emails, meeting minutes, presentations, letters, and reviews relating to T70 were sent using the names of the BAE Defendants. P195-P217.

## IV. DEFENDANT AIS'S ISSUE FOUR: PLAINTIFF'S CLAIM FOR BREACH OF THE T100 CONTRACTS IS BARRED BY APPLICABLE UCC PROVISIONS

### 1. Introduction and Background Facts

Gyrodata's Second Claim alleges that AIS's untimely deliveries of T100 gyroscopes breached six different contracts at least 26 times over a span of 47 months. D49. By Gyrodata's own admission, however, it continued to issue successive purchase orders for the same product, year after year, notwithstanding that AIS was allegedly in near-constant breach of earlier purchase orders. D50. After every late delivery of T100s, Gyrodata purchased still more T100s, without ever

[13] Gyrodata's first two T70 payments were made to "BAE Systems/Condor Pacific," reflecting its uncertainty (BAE accepted them). P207. BAE points to inadmissible *drafts* from 2008 settlement negotiations. FED. R. EVID. 408. Even if considered, Gyrodata never signed or approved the drafts, and other versions listed "BAE" as the contracting party with no indication of who changed the language.

[14] Bonsick's declaration contradicts sworn testimony and records. Bonsick did not even know what BAE company he worked for or how company records designate which company employees worked for. Bonsick Tr. (12/8/09), 9:4-16; 12:21–13:7.

[15] The parties have stipulated to the authenticity of their own business records. The Esparza Declaration merely summarizes BAE's own records and testimony. FED. R. EVID. 1006 (summary charts); FED. R. EVID. 801(d)(2)(A) (party admission).

explicitly claiming a breach. D51, D73; EA 005 ¶4-5, 8-9, 13-15. Gyrodata admits that it tempered its complaints because it did not want to disrupt its supply of T100s. D52. On these facts, Gyrodata's T100 contract claims fail as a matter of law because (1) Gyrodata did not provide adequate notice of breach to AIS within a reasonable time as required by Com'l Code § 2607(3)(A), and (2) Gyrodata accepted subsequent installments without objection after each allegedly untimely delivery, thereby reinstating each contract and waiving any previous breach(es) pursuant to Com'l. Code § 2612.

Of the 12 purchase orders between Gyrodata and AIS from 2000-2009, six are at issue in this action ("the disputed POs"). D56. AIS delivered, and Gyrodata received and paid for, all 600 T100s ordered under the disputed POs. D57-D60. Gyrodata has added these T100s to its operating inventory of T100s used to provide services to its customers. D61. Gyrodata admits it did not refuse T100 shipments for untimely delivery. D62; EA 483, p.8460. None of Gyrodata's payments was made under protest or with reservation of rights. D63-D64; EA 005, ¶9. Following the disputed POs, Gyrodata placed another order -- its largest ever -- for 168 regular T100s. D65. Although Gyrodata expressed dissatisfaction with the pace of T100 deliveries, Gyrodata never expressed that it considered AIS to be in breach of the T100 contracts or claimed AIS was responsible for any losses attributable to untimely deliveries. D71-D74; EA 005, ¶10.

2. <u>Gyrodata Failed To Give Notice Of Breach Within A Reasonable Time</u>

When a buyer has accepted a tender of goods, he "must, within a reasonable time after he or she discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy." Com'l. Code § 2607(3)(A). In interpreting § 2607(3)(A), the "vast majority" of courts have taken the position that as between merchants, the buyer must notify the seller not merely that he considers the transaction troublesome, but that he considers the seller in breach. *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 972 (5th Cir. 1976) (applying Cal.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

law); *see also K & M Joint Venture v. Smith Int'l., Inc.*, 669 F.2d 1106, 1111 (6th Cir. 1982) (same). The cases relied upon by Gyrodata are inapposite, as they either pertain to consumer transactions involving a single sale (*Stearns*) or interpret Texas law, which does not apply here (*Kern Oil*). Gyrodata Opp., p. 18.

Gyrodata did complain about late T100 deliveries, D71, but as a matter of law its complaints do not amount to notice of breach because as it continued to place T100 orders, it negated whatever notice its earlier complaints provided. Courts have recognized that: "the notice requirement reconciles the seller's right to early warning of claims for breach with the need to accommodate the buyer who, for reasons of necessity, has to accept a tender which is not in full compliance with the contract. In a continuing contractual relationship, therefore, the buyer must decide whether the benefits of claiming a breach of contract outweigh the need for a close rapport with the seller." *Eastern Air Lines,* 532 F.2d at 979; *see also K&M Joint Venture*, 669 F.2d at 1115-1116 ("K&M, an experienced party, chose to follow a course of conduct [i.e., continuing to place additional orders] which failed to inform Calweld that it was claiming a breach of warranty. Under these circumstances, there is no inequity in requiring it to bear the consequences of its decision."); *Cities Service Helex, Inc. v. United States*, 543 F.2d 1306, 1316 n. 23 (Ct. Cl. 1976).

AIS did not learn that Gyrodata considered it to have breached the T100 contracts until after Gyrodata filed its lawsuit. D76; EA 005, ¶12. Gyrodata thus did not provide notice of breach until nearly four years after the first breaching deliveries, which is not timely. *Pollard v. Saxe & Yolles Dev'l Co.*, 12 Cal.3d 374, 380 (four years is too late); *Silvera v. Broadway Dep't Store, Inc.*, 35 F.Supp.625, 626-27 (S.D. Cal. 1940) (7-1/2 months is not reasonable).

3. <u>Gyrodata Waived Any Previous Breach By Acceptance</u>

A party reinstates an installment contract if, *inter alia*, "he accepts a nonconforming installment without seasonably notifying of cancellation . . .." Com'l Code § 2612(3). The notice of breach should be explicit and in writing. *Cities Serv.*,

543 F.2d at 1316 n. 23; Masterson, Baron & LaMothe, CALIFORNIA CIVIL PRACTICE BUSINESS LITIGATION, § 40:63, (Where the buyer accepts a late delivery under an installment contract, failure to make a written reservation of rights may be deemed a waiver of the right to object). Although Gyrodata denies it paid for the T100s at issue without reservation of rights, no payments or letters express such a reservation. D63-D64. Thus Gyrodata reinstated the contract on each occasion and waived all claims for breach based on late delivery.

**PLAINTIFF'S RESPONSE: REASONABLE NOTICE WAS GIVEN**

**1. Gyrodata gave adequate notice under section 2607(3)(A)**

California law requires only that notice under section 2607(3)(A) be "reasonable." *Cardinal Health 301, Inc. v. Tyco Elecs. Corp.*, 169 Cal. App. 4th 116, 135 (Cal. App. 2008). Notice is sufficient if it merely "let[s] the seller know that the transaction [is] still troublesome and must be watched …." *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1143 (N.D. Cal. 2010) (*quoting* CAL. COMM. CODE § 2607 cmt. 4). Notice need not be in writing. *Id.*; *see also T.J. Stevenson & Co., Inc. v. 81,193 Bags of Flour*, 629 F.2d 338, 359 (5th Cir. 1980).

The Ninth Circuit applies section 2607's notice requirement leniently. In *Kern Oil & Refining Co. v. Tenneco Oil Co.*, 840 F.2d 730 (9th Cir. 1988), the Ninth Circuit affirmed a $32-million judgment for shortages in an oil supply contract occurring over 18 months, holding that "Section 2.607's notice requirement should not be applied stringently." *Id.* at 737. Since Gyrodata "married" its tool to the T100 gyro and was totally dependent on BAE for timely deliveries, it is important to remember that courts "should not expect a married party to complain as loudly as one who is free to play the field." *Id.*

Gyrodata easily satisfied the notice requirements of section 2607(3)(A). Beginning shortly after deliveries of T100s began to be late, Gyrodata told BAE/AIS frequently and insistently that it was missing delivery deadlines, this was causing serious problems for Gyrodata and BAE/AIS must deliver the T100 gyroscopes on

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

time — in other words, "the transaction is still troublesome and must be watched." P219-25, 227-30, 232; Uttecht Decl., ¶¶ 46-51 (EA 11, pp. 877-80); Klopp Decl., ¶¶ 9, 32 (EA 8, pp. 831, 838). Further, BAE/AIS knew there was a serious problem and Gyrodata was upset. P226, 231, 233-39, 241, 244, 246-47.

Defendants pin their hopes on the Fifth Circuit's early *Erie* guess that California would impose a more stringent standard for notice under section 2607(3)(A). *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 973 (5th Cir. 1976) (buyer must tell seller that its deliveries are late and that buyer considers seller to have violated the contract).[16] As discussed above, that guess turned out to be wrong. Further, many courts outside of California have rejected the stricter standard articulated in *Eastern Air Lines*. *See, e.g., United States v. Southern Contracting of Charleston, Inc.*, 862 F. Supp. 107, 110-12 (D.S.C. 1994) (denying summary judgment and citing many cases, treatises and reasons in support of a lenient notice standard). Finally, even the Fifth Circuit acknowledged that "the adequacy and timeliness of notice under section 2-607 typically depend upon the reasonableness of the buyer's efforts to communicate his dissatisfaction. … [W]hether the notice requirement has been complied with is a question which is particularly within the province of the jury." *Eastern Air Lines*, 532 F.2d at 973. In fact, the Fifth Circuit reversed a directed verdict for this very reason, noting that "the conflict in evidence … and the dissatisfaction with the delays evident in several … communications … are sufficient to create a jury question." *Id*. at 979.

Even if the stricter notice standard were applicable in this case, Gyrodata satisfied it easily by notifying BAE/AIS early and often that it considered late deliveries to be violations of the T100 contracts. P223, 225, 232; Uttecht Decl., ¶ 49 (EA 11, pp. 878-79); Klopp Decl., ¶ 31 (EA 8, p. 838). BAE/AIS knew how

[16] Defendants also cite *K & M Joint Venture v. Smith Int'l, Inc.*, 669 F.2d 1106 (6th Cir. 1982), but that Sixth Circuit opinion dealt with the defective shipment of a single tunnel boring machine, not late deliveries of multiple installments of goods, and thus raises very different notice issues than this case.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

Gyrodata felt. P233. At a minimum, therefore, fact issues concerning the content of notice, its timing and the circumstances surrounding each communication preclude summary judgment.

2. <u>Gyrodata did not waive its right to damages</u>

Section 2607(2) of the California Commercial Code expressly provides that "[a]cceptance does not of itself impair any other remedy provided by this division for nonconformity." Further, section 2612(3) states: "[A party also *reinstates* an installment contract] if he brings an action with respect only to past installments …." (emphasis added). A contract that is reinstated remains in force; thus, Defendants' position that a buyer waives damages for past installments by reinstating the contract is both illogical and textually inaccurate.

The Sixth Circuit explained how section 2612(3) applies to a buyer who decides not to declare breach of the whole contract because of defects in early installments:

> Upon discovery of the defects in the early shipments, [buyer] was entitled to insist that shipments continue on schedule and that the defects be cured, i.e., that [seller] perform as agreed. And, by timely notifying [seller under section 2607(3)(A), buyer] preserved all of its remedies …, including its right to consequential damages ….

*Plastic Moldings Corp. v. Park Sherman Co.*, 606 F.2d 117, 120 (6th Cir. 1979). Thus, giving repeated notice under section 2607(3)(A) allowed Gyrodata to accept late deliveries of T100s without waiving its right to damages or requiring it to declare a breach of the whole contract. Gyrodata was not required to accept late deliveries "with reservation of rights"; under the U.C.C., that practice is permissive, not mandatory. *See* CAL. COMM. CODE § 1308 cmt. 2. Similarly, giving BAE/AIS repeated notice negates any notion that Gyrodata intentionally relinquished its right to damages for breaches of prior orders when it ordered more gyroscopes, especially when Defendants fraudulently persuaded Gyrodata to continue. *See, e.g., Hartung v. Pollastrini*, 147 Cal. App. 2d 88, 92 (Cal. App. 1956).

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

## V. DEFENDANTS' ISSUE FIVE: PLAINTIFF'S FRAUD CLAIM IS BARRED BY THE ECONOMIC LOSS RULE

### 1. Introduction

Gyrodata alleges fraud relating to delivery of T100s and performance of the T70 contract. D78. The alleged misrepresentations, however, are contractual and contract-related promises between commercial merchants. The fraud claim is thus barred by the economic loss rule, which precludes tort recovery for purely economic loss due to disappointed contractual expectations unless the plaintiff "can demonstrate harm above and beyond the broken contractual promise." *See Robinson Helicopter Co. v. Dana Corp.*, 34 Cal.4th 979, 988 (2004).

The representations at issue here all surround and restate AIS's contractual obligations. Regarding the T70, Defendants are accused of falsely representing the who (which engineers), where (which facility) and when (level of commitment, timing of production) of performing the alleged contractual obligation to provide working prototypes of a T70 gyroscope. D79-D81; EA 481, ¶44-45, 48-50, 52(b). Regarding the T100, Defendants are accused of falsely representing the production (which facility) and timely delivery of T100 gyroscopes. D82-D83; EA 481, ¶52(a).[17]

Under California law, "conduct amounting to a breach of contract becomes tortious only when it also [1] violates a duty *independent* of the contract arising from principles of tort law" and [2] "expose[s] a plaintiff to liability for *personal damages* independent of the plaintiff's economic loss". *Robinson*, 34 Cal.4th at 989, 993 (emphasis added); *United Guar. Mortgage Indem. Co. v. Countrywide Fin. Corp.*, 660 F.Supp.2d 1163, 1182-1183 (C.D. Cal. 2009).[18]

---

[17] For the reasons set forth on p. 22, fn. 28, BAE Defendants join in this argument.

[18] See *also, Alvarado Orthopedic Research, L.P. v. Linvatec Corp.*, No. 11-CV-246 IEG, 2011 WL 3703192, *3 (S.D. Cal. Aug. 23, 2011); *Multifamily Captive Group LLC v. Assurance Risk Managers, Inc.*, 629 F.Supp.2d 1135, 1145-1146 (E.D. Cal. 2009); *Intelligraphics, Inc. v. Marvell Semiconductor, Inc.*, No. C07-02499 JCS, 2009 WL 330259, *17 (N.D. Cal. Feb. 10, 2009).

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

Here, plaintiff fails on both counts. Gyrodata has not proven any duty owed to it by any Defendant independent of the contractual responsibilities. The alleged misrepresentations are merely communications and performance between two commercial entities regarding their contractual obligations. Gyrodata has also not presented evidence that Defendants' fraud/breaches have exposed Gyrodata to any personal damage independent of its economic losses.[19] Gyrodata admitted that its damages flowing from fraud are identical to the damages suffered by reason of the breaches of contract. D84-85, EA 481, p.8526.

Plaintiff's case is for breach of contract; no fraud claim can be maintained.

2. <u>The Economic Loss Doctrine</u>

The economic loss rule has been applied to fraud claims in California. *See, e.g., Alvarado*, 2011 WL 3703192, *2-3; *Multifamily*, 629 F.Supp.2d at 1146; *Oracle USA, Inc. v. XL Global Services,*, No. C09-00537 MHP, 2009 WL 2084154, *4 (N.D. Cal. July 13, 2009); *Intelligraphics*, 2009 WL 330259, *17.

The issue of application of the economic loss rule to claims for fraud in the performance of a contract was addressed by the California Supreme Court in *Robinson*, where the defendant, who was obligated by contract to supply a safety mechanism, provided false certificates of conformance with manufacturing specifications. *Robinson*, 34 Cal.4th at 985-987. The Court held that, based solely "on Dana's provision of the false certificates of conformance," the facts gave rise to an exception to the economic loss rule. *Id.*, 34 Cal.4th at 990. "Dana's tortious conduct was separate from the breach itself, which involved Dana's provision of the nonconforming clutches. . . . We hold the economic loss rule does not bar Robinson's fraud . . . claims *because they were independent* of Dana's breach of contract." *Id.*, 34 Cal.4th at 991 (emphasis added).

"But the *Robinson Helicopter* Court did not rest its exception solely on

[19]California law requires a plaintiff to show "personal damage" beyond its economic loss to maintain a tort claim apart from a contract claim. *Jimenez v. Superior Court*, 29 Cal.4th 473, 483 (2002).

extraneous fraud in the certificates. Before allowing an exception, the Court noted that the fraudulent safety components '*exposed Robinson to liability for personal damages* if a helicopter crashed and to disciplinary action by [the FAA].' [Citation omitted.] And the Court summarized its holding as 'narrow in scope and limited to a defendant's affirmative misrepresentations on which a plaintiff relies *and which expose a plaintiff to liability for personal damages independent of the plaintiff's economic loss.*' [Citation omitted.]." *Countrywide*, 660 F.Supp.2d at 1183 (emphasis in original), citing *Robinson*, 34 Cal.4th at 991, 993. "The exposure to liability for personal damage was key to *Robinson Helicopter's* holding that the economic loss rule did not bar tort remedies in that case." *Oracle*, 2009 WL 2084154 at *6.

3. Defendants Did Not Have A Duty Independent of the Contracts

Defendants' alleged misrepresentations all relate to the duty to perform the contract. They are a reiteration of contractual obligations, and the alleged breaches thereof, under the T70 and T100 contracts, and thus are not actionable in fraud. *See*, e.g., *Multifamily*, 629 F. Supp. 2d at 1146 (representations related to the duty to perform the contract itself); *Intelligraphics*, 2009 WL 330259 at *17 (representations were "a reiteration of the obligations that exist under the contract"); *Countrywide*, 660 F.Supp.2d at 1184 ("the alleged misrepresentations are not conceptually distinct from the contract"); *Oracle*, 2009 WL 2084154 at *7 (no conduct independent from the promises made by the parties in the course of their contractual relationship).[20]

Gyrodata alleges that Defendants made representations to keep Gyrodata quiescent and to induce it to continue buying T100 gyroscopes, including misrepresentations about the impact of the T100 production transfer from Westlake to Cheshire, and the ability of the Cheshire facility to produce T100s. D82, D87, D96; EA 481, ¶44-47. Further misrepresentations allegedly were made "regarding the T70

[20]Moreover, an "omission to perform a contract obligation is never a tort, unless the omission is also an omission of a legal duty." *Litton*, 7 Cal.4th at 515. And regardless, the "omissions" identified by Gyrodata in its response to AIS's Interrogatory No. 4 all relate to the ability to properly perform the T70 and T100 contracts. D86; EA482, p.8437-38.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

gyroscope," including whether the T70 development approach was correct, whether the engineering team would remain on the job in Westlake, when T70 prototypes would be ready, and when Defendants would present Gyrodata with proof of concept models. D79-81; EA 482, p.8436-38.

Gyrodata does not even argue that Defendants' fraudulent acts violate a duty independent of the T70 or T100 contracts; evidence of the falsity of any of the alleged representations is evidence of the defendants' breach of contractual obligations to manufacture, deliver and perform under these contracts. Instead, Gyrodata argues *Robinson* did not hold that an independent duty is necessary, but rather that an intentional misrepresentation is an exception to the economic loss rule regardless whether the fraudulent conduct is related to the performance of the contract. Gyrodata Opp., p.27. *Robinson* itself holds otherwise: the economic loss rule did not bar the fraud claim "*because*" the conduct was independent of the breach of contract. *Robinson*, 34 Cal.4th at 991. Other courts agree that, to support a claim for fraud, a plaintiff must establish the misrepresentations violate a duty *independent* of the contract. *See*, *supra*, at p. 23 (citing *Multifamily*, *Intelligraphics*, *Oracle*). Gyrodata offers no evidence to establish such a duty in tort independent of the duty to perform the contractual obligations.

4. Gyrodata Has Not Been Exposed to Personal Damages

Gyrodata's fraud claim is also barred if the alleged misrepresentations did not expose Gyrodata to liability for personal damages independent of its economic loss.[21] *Robinson*, 34 Cal.4th at 993; *County of Santa Clara v. Atl. Richfield Co.*, 137 Cal.App.4th 292, 328 (2006) (economic loss rule does not bar fraud action against makers of lead paint "*where the plaintiff can establish that the fraud exposed the plaintiff to liability*" for personal damage from people exposed to lead paint,

[21] Economic loss "generally means pecuniary damage that occurs through loss of value or use of goods sold or the cost of repair together with consequential lost profits when there has been no claim of personal injury or damage to other property." *S.F. Unified School Dist. v. W.R. Grace & Co.*, 37 Cal.App.4th 1318, 1327, n. 5 (1995).

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

independent of its economic harm) (emphasis added). The damage must be *personal* to the plaintiff, not a general harm to the public.[22] *Aas v. Superior Ct.*, 24 Cal.4th 627, 646 (2000) (nonspeculative, present injury is essential element of tort claim); *KB Home v. Superior Court*, 112 Cal.App.4th 1076, 1088 (2003) ("the Supreme Court has unequivocally rejected [] a life-safety exception to the economic loss rule"). Courts have held that exposure to personal damage is necessary to sustain an exception to the economic loss rule for a fraud claim. *Multifamily*, 629 F.Supp.2d at 1146 (summary judgment on fraud claim); *Oracle*, 2009 WL 2084154 at *6 (dismissal of fraud claim); *Intelligraphics*, 2009 WL 330259 at *17 (summary judgment where no evidence that fraud exposed plaintiff to liability beyond economic loss attributable to breach of contract). These courts -- which are not considering product liability claims[23] -- contradict Gyrodata's assertion that *Robinson* holds that, if plaintiff's claim is for fraudulent conduct, the economic loss rule does not bar a claim even if the damages are the same as those in contract (Gyrodata Opp., p.27).[24]

Here, Gyrodata has not produced evidence that the alleged fraud has exposed it to personal liability. D88-D94; EA 367, p. 6942; EA482, p.8448-50 (detailing the scope of damages sought by Gyrodata). There is no evidence of a claim against

---

[22]Gyrodata's First Supplemental Responses to AIS's First Set of Special Interrogatories, served in the midst of briefing the summary judgment motion, may not be used to amend its claim. *Netbula, LLC v. BindView Dev. Corp.*, 516 F. Supp.2d 1137, 1153 n. 9 (N.D. Cal. 2007).

[23]Although Gyrodata suggests the "personal damage" limitation in *Robinson* is restricted to product liability cases (Gyrodata Opp., p.28), at least two courts have suggested the *Robinson* ruling itself applies only to product liability cases. *Countrywide*, 660 F.Supp.2d at 1183, citing *Oracle*, 2009 WL 2084154 at *6. By this authority, Gyrodata's argument that *Robinson* recognizes a fraud exception to the economic loss rule fails in its entirety in this commercial contract case.

[24]Gyrodata cites two cases as "consistent with [its] proper interpretation of *Robinson*." Gyrodata Opp., p.27-28. *Western Emulsions*, 2007 WL 1839718 at *9, is a case addressing an argument raised on summary judgment in a reply brief that the economic loss rule bars recovery of punitive damages. The case is distinguished in Judge Patel's thorough analysis of the economic loss rule in *Oracle* as a cursory, one sentence examination of Robinson that "did not address the exposure-to-liability issue stressed by the California Supreme Court." *Oracle*, 2009 WL 2084154 at *6. *Benis*, 2011 WL 3714783 at *5, denies a motion to dismiss asserting the economic loss rule where the defendant is alleged to have forged signatures on a loan document, and similarly makes no mention of the exposure-to-liability issue in its brief analysis.

Gyrodata, or even of a threat of a claim. It has admitted that its damages on the fraud claim are *identical* to its contract damages. D85, EA 485, p.8526 (Gyrodata's Rule 26 Disclosure Statement "[f]or defendants' fraud, plaintiff seeks all losses described in subparagraphs (1) and (2) above [setting forth damages for breach of the T70 and T100 contracts]"). And even when asked directly if it suffered any different damage by reason of the fraud, Gyrodata's responses were a list of all *economic losses* (e.g., value of wasted time, cost of mitigating alternatives, losses from delay) that are contract damages and not personal damages. D91-D95; EA 482, p.8448-50. Gyrodata has acknowledged the obvious: any damage suffered by it is economic loss, and not personal damage. *See*, *Intelligraphics*, 2009 WL 330259 at *15, 17 (summary judgment on fraud claim where no evidence that fraud exposed plaintiff to any harm beyond losses due to breach of contract).

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

5. Conclusion

New gyroscope development or production for commercial directional oil drilling operations is not the kind of extracontractual liability recognized by California courts as an exception to the economic loss rule. Instead, the commercial conduct between Gyrodata and AIS is akin to the mortgage insurance in *Countrywide*, the payment for services in *Oracle*, the exclusivity of insurance brokers in *Multifamily*, and the timeliness of contract performance in *Intelligraphics*.

For all these reasons, the economic loss rule applies to bar Gyrodata's claim for fraud, both (or separately) as to the T70 and the T100.

**PLAINTIFF'S RESPONSE: THE ECONOMIC LOSS RULE DOES NOT BAR GYRODATA'S FRAUD CLAIMS**

1. The California Supreme Court holds that the economic loss rule does not apply to fraud cases

The most recent *Erie* guidance from the California Supreme Court about the economic loss rule is contained in *Erlich v. Menezes*, 21 Cal. 4th 543 (1999) ("*Erlich*"), and *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979 (2004) ("*Robinson*"). In *Erlich*, the Supreme Court discussed when a breach of contract is

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

also a tort. *Erlich*, 21 Cal. 4th at 552-54. The court stated, "[g]enerally, outside the insurance context, a tortious breach of contract may be found when … the breach is accompanied by a traditional common law tort, such as fraud or conversion …." *Id*. at 553-54 (internal quotation marks and ellipsis omitted).[25]

*Robinson* held that the economic loss rule did *not* bar fraud and intentional misrepresentation claims that were related to breach of contract claims arising out of the sale of defective components of a helicopter. *Robinson*, 34 Cal. 4th at 985-88. *Robinson* quoted the passage from pages 553 through 554 of *Erlich* and then concluded that "Dana's fraud is a tort independent of the breach [of contract]." *Id*. at 991 (*citing* only *Erlich*, at 553-54). The court announced its holding in the very next sentence: "We hold the economic loss rule does not bar Robinson's fraud and intentional misrepresentation claims because they were independent of Dana's breach of contract." *Id*. (*citing* only *Erlich*, at 552-54). This was true notwithstanding the fact that "[the] misrepresentations of fact … [constituted] fraudulent conduct *related to the performance of the contract*," *id*. (emphasis added), and that damages (cost of replacement parts and incidental administrative costs) were contractual in nature. *Id*. at 986-87; *see also* CAL. COMM. CODE §§ 2714, 2715. The *Robinson* court's quotation and repeated citation of the key portions of the *Erlich* decision resolve any doubt that the economic loss rule does not bar fraud claims even if those claims are related to breach of contract claims.[26]

*Robinson* is a California Supreme Court decision, and this Court need go no further in making its *Erie* determination. However, the Ninth Circuit reads *Robinson* the same way Gyrodata does. *Hannibal Pictures, Inc. v. Sonja Productions LLC*, 432

[25] As discussed below, Defendants correctly point out that there is case law suggesting that *Robinson* should be restricted to products liability cases. Defs.' Arg., p. 22-3. If so, that would mean that *Erlich*—which is not a products liability case—governs this case and Gyrodata's fraud claim stands.

[26] California Civil Code section 1572 also supports Gyrodata's view: ("Actual fraud … consists in any of the following acts, *committed by a party to the contract*, … with intent to deceive another party … 1. [t]he suggestion, as a fact, of that which is not true, by one who does not believe it to be true; … [or] 3. [t]he suppression of that which is true, by one having knowledge or belief of the fact ….") (emphasis added).

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

Fed. App'x. 700, 701 (9th Cir. 2011) ("The California Supreme Court has declined to apply the economic loss rule to fraud and misrepresentation claims where, as here, one party has lied to the other.") (*citing Robinson*). Further, district courts in the Central District of California have issued decisions that are in accord. *See, e.g.*, *Benis v. Sallie Mae, Inc.*, No. CV 11-00402-ODW (VBKx), 2011 WL 3714783, at *5 (C.D. Cal. Aug. 24, 2011) (Judge Wright) (the economic loss rule does not bar claims of fraud or fraudulent concealment); *Western Emulsions, Inc. v. BASF Corp.*, No. CV 05-5246 CBM (SSx), 2007 WL 1839718, at *9 (C.D. Cal. Jan. 19, 2007) (Judge Marshall) (the economic loss rule does not bar fraud claims); *see also Silver v. Goldman Sachs Group, Inc.*, No. CV 10-4961 RSWL (AJWx), 2011 WL 1979241, at *5 (C.D. Cal. May 19, 2011) (Judge Lew) (adding negligent misrepresentation to the list of "traditional common law tort[s]" not barred by the economic loss rule).

*Robinson*'s statement that its decision is "limited to a defendant's affirmative misrepresentations … which expose a plaintiff to liability for personal damages" is simply a "reference[] to the products liability version of the [economic loss] rule."[27] *United Guar. Mortg. Indem. Co. v. Countrywide Financial Corp.*, 660 F. Supp. 2d 1163, 1183 (C.D. Cal. 2009) (Judge Pfaelzer) (omitting internal quotation marks). Because this action is *not* a products liability case, Gyrodata can therefore rely on the intentional fraud exception to the economic loss rule discussed above.

2. Defendants' fraud endangered public health, safety and welfare

Even if Gyrodata were required to also show an enhanced risk to its own or the public's health and safety, it has done so. Defendants' fraud delayed introduction of the GWD70 device by many years. Uttecht Decl., ¶ 73 (EA 11, p. 894). The GWD70 not only helps oil and gas companies find reserves more efficiently and with fewer wells but reduces gross errors, avoids potentially disastrous wellbore collisions and helps establish true wellbore location in the event offset (relief) wells must be

[27] *Robinson* acknowledged that "[d]ealing with affirmative acts of fraud and misrepresentation raises different policy concerns than those raised by negligence or strict liability claims." *Robinson*, 34 Cal. 4th at 991 n.7.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

drilled to stop blowouts. *Id.*, ¶¶ 73-79 (EA 11, pp. 894-97). The delay sharply increased the risk of personal injury, property loss and environmental damage from wellbore collisions. *Id.*; Thorogood Tr. (3/11/10), 69:1-18. Even defense experts concede the point. Oberkircher Tr. (4/7/10), 47:14–48:8. The delay exposed Gyrodata to liability for personal damages, and the risk was not insubstantial — Gyrodata has been sued for operator errors within the last decade. Uttecht Decl., ¶ 78 (EA 11, pp. 896-97).[28] ; EA476, p.8534-36 (Gyrodata's damages not limited to contract losses).

3. <u>The BAE Defendants cannot have their cake and eat it too</u>

The BAE Defendants cannot both deny being parties to the T70 contract and claim the benefits of the economic loss rule. The immunity (of whatever scope) provided by the economic loss rule does not apply to a non-contracting corporate affiliate who engages in tortious wrongdoing. *Cf. Legal Additions LLC v. Kowalski*, No. C-08-2754 EMC, 2010 WL 1999894, at *3 (N.D. Cal. May 18, 2010).

## VI. <u>DEFENDANTS' ISSUE SIX: GYRODATA CANNOT MAINTAIN A CLAIM FOR FRAUDULENT INDUCEMENT</u>

Although the thrust of Gyrodata's fraud claim is misrepresentations about the manufacture, delivery and performance of the T70 and T100 contractual obligations, Gyrodata has said it was "induced" to place later purchase orders for additional T100s by AIS's representations to make timely deliveries. D87; EA 481, p.8416. There is no inducement claim regarding the T70 contract. D95.

As a matter of law, however, Gyrodata cannot maintain a claim for fraudulent inducement of the T100 contracts because fraudulent inducement requires reasonable reliance, which can be decided as a matter of law judged by an objective standard. *Alliance Mortg. Co. v. Rothwell*, 10 Cal.4th 1226, 1239-1240 (1995); *Countrywide*,

[28] Defendants contend that Gyrodata has not *actually* incurred liability for personal damages, but *Robinson* does not even arguably impose such a requirement. *Robinson*, 34 Cal. 4th at 993. No helicopters actually crashed in *Robinson*.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

660 F.Supp.2d at 1189. Reliance is proved by showing that the misrepresentation regarding the timing of delivery was "an immediate cause" of placing the orders for T100s, such as evidence that in the absence of the misrepresentation Gyrodata "in all reasonable probability" would not have entered into the T100 contracts. *In re Tobacco II Cases*, 46 Cal.4th 298, 326 (2009). Here, Gyrodata has presented no evidence that it would not have entered into the contracts but for the representations regarding timing of the delivery. In fact, it has said the opposite. In its Complaint, Gyrodata said it was presented with a "Hobson's choice" deciding between accepting untimely deliveries of T100s or not contracting with AIS and losing its "lifeline supply of T100s" because AIS is "the only company that manufactured these gyroscopes." D52. Gyrodata *chose* to go with its lifeline supply *regardless* of untimely deliveries. Gyrodata has admitted it had no choice but to go with the T100 contracts. *Id.* There is, therefore, no causation between the alleged misrepresentation about the timing of delivery and Gyrodata's inducement to sign contracts in reliance on the timing of deliveries.

In response, Gyrodata implies it could have repaired broken T100s instead of ordering new gyros in 2005-2007 (i.e., the damage period). D51; Gyrodata Opp., p.30. No evidence is presented of its ability to do so throughout that period. All Gyrodata says is that it stopped ordering T100s in 2008, after the damage period and after it developed the ability to manufacture T100s using IP developed under the T70 Program. D246; Gyrodata Opp., p.30-31. But 2008 has nothing to do with a claim for losses in 2005-2007. There is no fraudulent inducement. Gyrodata's remedy, if any, is for breach of the T100 contractual commitments for the timing of delivery.

**PLAINTIFF'S RESPONSE: GYRODATA RELIED ON FALSE PROMISES IN RE-ORDERING T100S**[29]

Gyrodata ordered T100s based on repeated assurances from 2004 through 2007 about the delivery schedule, transition status, yields and recovery plans. Uttecht

[29] Defendants dispute reliance only for inducement, not the remaining fraud claims.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

Decl., ¶¶ 47, 52-55, 71 (EA 11, pp. 877-78, 880-82, 893); Klopp Decl., ¶¶ 8, 27, 29 (EA 8, pp. 831, 837-38); P248-P269; Brosnahan Tr. (9/11/09), 112:8–113:21; Klopp Tr. (09/15/09), 40:14–42:15; Casparro Tr. (10/20/09), 82:15–88:12; 185:10–189:16, 199:17-19 (Marinello "lied," gave "faulty information" and was "dishonest"); EA 342, pp. 6343-44 (2006 ethics complaint). Defendants argue that Gyrodata depended on T100s but concede its "alternative in the short-term … to repair broken T-100 gyros … amassed over the years (over 500) and … develop another source." EA 91, p. 2244. In 2008, after discovering the fraud, Gyrodata stopped ordering new T100s and began repairing broken ones, as it had in the 1990s. Brosnahan Tr. (09/11/09), 109:19–110:24, (04/28/10) 172:1-11; Uttecht Tr. (9/9/09), 73:19–74:5. "[W]hether a plaintiff's reliance is reasonable is a question of fact." *Alliance*, 10 Cal. 4th at 1239; *Engalla v. Permanente Med. Group, Inc*., 15 Cal. 4th 951, 976-77 (Cal. 1997) (reliance may be inferred from material representations regarding timing and programs).

## VII. BAE DEFENDANTS' ISSUE SEVEN: PLAINTIFF'S FRAUD CLAIM AND TORTIOUS INTERFERENCE CLAIMS ARE TIME BARRED[30]

Count III of the SAC, alleging fraud against each Defendant, is barred by the three year statute of limitations for fraud. CAL. CIV. PROC. CODE §338(b). Gyrodata's fraud claims, filed on December 1, 2008, are largely time-barred, because Gyrodata knew or reasonably should have known of the alleged "misrepresentations/omissions" at issue in Count III of the SAC before the three year statute of limitations cutoff -- December 1, 2005. *See Kline v. Turner*, 87 Cal. App. 4th 1369, 1374 (2001). Counts IV and V of the SAC, alleging that BAE Defendants each tortiously interfered with the T100 and T70 contracts are entirely time barred by the even shorter two-year statute of limitations for tortious interference, with the cutoff date as December 1, 2006. See CAL. CIV. PROC. CODE § 339; *Eagle Precision Tech., Inc. v. Eaton Leonard Robolix, Inc.*, 2006 WL 6544087 *2 (S.D. Cal. 2006).

[30] AIS joins in this motion to the extent it addresses the fraud claim.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOSANGELES, CALIFORNIA 90071

**1. Gyrodata Knew before December 1, 2005 of T100 Manufacturing Transfer and Delays:**

Gyrodata knew about the transfer of T100 production to Cheshire and ensuing delays by mid-2005 (outside the applicable statutes of limitations). (D96-99, EA481, pp. 8416-8, EA364, p. 6591, EA363, pp. 6489, 6581-82, Casparro 12/19/11 Tr. 141:1-5). To the extent based on any decision to transfer T100 production from Westlake to Cheshire, the fraud and tortious interference claims are time barred. [31]

**2. Gyrodata Knew Before December 1, 2005 of T70 Development Problems**: Gyrodata's claims that Defendants secretly knew in 2003-2004 that the T70 design would fail, and then withheld results of an April 2004 modeling that predicted failure, are also time barred. (D112, EA364, p. 6591) Gyrodata agreed in 2003 to a T70 design approach based on miniaturizing the T100 gyro and was then told in May 2004, in May 2005, and in August 2005, that this approach would not and did not meet the shock goals. (D113-116). Gyrodata's Gary Uttecht acknowledged the T70 design approach failure in May 2005 and wrote that it was "fruitless to expend any more resources on the existing design until we had all agreed

[31] Uncorroborated and self-serving" testimony or affidavits cannot defeat a summary judgment motion. *Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir.2001). The self-serving declarations of Ms. Esparza and Messrs. Uttecht, Klopp, and Brosnahan relied upon by Gyrodata fail to raise triable issues. Esparza's self-serving attempt to recreate BAE's employment history based on hand-selected documents should be rejected for lack of personal knowledge. No evidentiary basis exists for finding that either "Platform Solutions" or "E&IS" are (i) corporate entities, rather than business units, or (ii) ever had any legally cognizable corporate existence or (iii) ever had any officers, directors, or employees, especially where it is undisputed by Gyrodata that "Platform Solutions" was a business unit comprised of different corporations, such as the Inertial Products business that was divested in 2007 (D44, EA2, pp. 18, 626-9, 633). Mr. Uttecht "opining" on BAE/AIS' fraudulent intent (Uttecht Decl., ¶60-61) also lacks personal knowledge and misstates the evidence (Kelly Decl., EA7, pp. 758-62 (showing critical misstatements). *Various Slot Machines*, 658 F.2d at 700-01 (statements demonstrated to be false should be disregarded). Mr. Klopp simply adopts Mr. Uttecht's declaration (Klopp Decl, ¶37) without any personal knowledge or citations to evidence (e.g. ¶40). Mr. Brosnahan's claim that Gyrodata had "no way of knowing" in 2005 that the Westlake facility would close because Chris Persico only reported "rumors" contradicts his own notes, Mr. Uttecht's and Mr. Persico's admissions, a contemporaneous press release, and Gyrodata's privilege log communications – all showing that Gyrodata knew of Westlake's closure in November 2005.

on what would be the next step," which BAE Inertial and Gyrodata did at the August 2005 T70 joint status meeting. (D118, EA311 , p. 6167).[32]

**3. Gyrodata Knew Before December 1, 2005 of Westlake Closure:**

Any claims based on "secret" Westlake closure plans is also time barred. (D125, EA2, pp. 603-4, EA514, p. 8919). Gyrodata knew in November 2005 that BAE Inertial was closing the Westlake facility, which was also reported in the press. (D125, 128; Persico Tr. 1/04/12, 222:7-228:15 (EA280-1, pp. 5715, 5722); Uttecht Tr. 12/23/11, 211:14-214:8). Gyrodata then commenced unsuccessful contractual negotiations to possibly retain some T70 engineers in Westlake but such negotiations, as a matter of law, do not toll the statute of limitations. (*Id*., D127, Persico Dep. Tr. 1/04/12, 233:4-246:16, EA278, pp. 5384-93). Both Count III and Count V of the SAC are premised on the closure of Westlake, which Gyrodata knew about before the three year fraud bar (December 1, 2005) and the two year tortious interference bar (December 1, 2006), so the fraud claim should be dismissed to the extent it is based on the Westlake closure, and the tortious interference claim (Count V) should be entirely barred.

Gyrodata's 2006 privilege log entries and litigation threats clearly show that Gyrodata knew of its fraud and interference claims but neglected to timely bring them. Gyrodata consulted with its counsel of record when Westlake's closure was announced in 2005 regarding the T70 contract and T100 production and then strategized with counsel "in anticipation of litigation" and its "potential claims against

[32](*See* D113-116, D118-122, D204-205; Persico Tr. 1/04/12, 47:18-22, 87:23-89:22 (EA277, pp. 5354-82), C. Persico Tr. 1/04/12, 114:5-20; Casparro Tr. 12/19/11, 160:15-161:19 (confirming the April 2004 shock data was discussed with Gyrodata in May 2004) (*see* EA344, p. 6348-9); D118 (shock data from prototype testing provided to Gyrodata in May 2005); Golden Tr. 1/06/12, 184:11-185:5; Uttecht Tr. 12/23/11, 201:8-12; Hoffman Tr., 100:1-25 (stating that he thought designing a new cross-leaf suspension for the T70 would be costly and take at least a year)). Gyrodata's claim that the August 2005 presentation "omitted" some information inaccurately cites to the evidence. (EA7, p. 758-62; EA345, pp. 6351-6). Contrary to Gyrodata's "continuous tort" argument, the statute of limitations for tortious interference with the T70 and T100 contracts began to run when Gyrodata first learned of the actionable injury based on its first T100 POs. *Vaca v. Wachovia Mortg. Corp*., 198 Cal. App. 4th 737 (2011).

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

BAE" on numerous occasions in January 2006 and then 150 times in 2006. (D108, EA7, pp. 773, 780, 782, 787, 794). Gyrodata's President threatened BAE Inertial with litigation in June and August 2006, stating Gyrodata's "interference" allegations. (D109; EA333, p. 6239-41, Gerber Tr. 12/03/09, 143:17-145:18). Gyrodata thus failed to timely bring its fraud and tortious interference claims.

**PLAINTIFF'S RESPONSE: GYRODATA'S FRAUD AND INTERFERENCE CLAIMS ARE TIMELY**

Gyrodata's fraud and tortious interference claims are timely because: (a) many underlying acts occurred within applicable limitations periods; (b) prior acts are timely due to the discovery rule; (c) estoppel bars the assertion of limitations; and (d) the "continuing tort" doctrine applies.

1. Fraud occurring after December 2005 and contractual interference occurring after December 2006 are admittedly timely

Defendants' Rule 9(b) motion was denied, and Gyrodata's interrogatory responses have been ruled sufficient. ECF No. 50; ECF No. 177 at 5. Defendants committed fraudulent acts after December 2005. Uttecht Decl., ¶¶ 66-67 (EA 11, pp. 888-91); EA 482, 8438-39; EA 364, p. 6591 (chart listing misrepresentations). Defendants' documents are replete with fraud throughout 2006 and 2007. EA 395, pp. 7182-84; EA 422, p. 7580.

The BAE parent entities committed numerous acts of tortious interference after December 2006. "Project Crossroads" was a largely secret, integrated and rolling termination and restructuring program implemented by BAE Systems, Inc., that did not end until 2007. *See* EA 2, pp. 603-04; *see also* EA 147, pp. 2826-29 (as of December 1, 2006, the remaining plant reductions were not yet completed). One of the project's key components was to cut engineering resources and personnel available to Gyrodata's programs. *See* EA 147, pp. 2826-29 (engineering reductions in Westlake, Cheshire, and Wayne facilities). Three T100 purchase orders in this case require deliveries after December 2006. *See* EA 11, pp. 915-17; EA 187, p.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

3262. Each act of tortious interference in a continuing series triggers a new limitations period. *See, e.g., Moser v. Triarc Co., Inc.*, No. 05cv1742-LAB (WMc), 2007 WL 1111245, at *2-3 (S.D. Cal. Mar. 29, 2007). Defendants therefore interfered with T100 deliveries — as well as the T70 project — after December 2006 in the course of implementing Project Crossroads. EA 94, p. 2304; EA 110, p. 2418; EA 209, p. 3367; EA 146, p. 2823; *see also* EA 108, p. 2411 (redirecting engineering resources to "fire fighting" production disasters for another customer).

2. Gyrodata filed suit within three years of discovering fraud and two years of discovering tortious interference

"The cause of action [for fraud] is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud …." CAL. CODE CIV. PROC. § 338(d). The inquiry is not when the lies were told but *when the truth was discovered*. Defendants challenge only three allegations of fraud:

**(a)** Westlake closure. It was not until February 2006 that a final decision firing all Westlake engineers was made and communicated. Uttecht Decl., ¶ 16 (EA 11, p. 863); Klopp Decl., ¶ 40 (EA 8, p. 841). Until then, BAE said no final decision had been made and continued to negotiate to keep resources at Westlake. Brosnahan Decl., ¶¶ 31-36 (EA 3, pp. 646-48). Defendants admit this. *See* D202-04; EA 278, pp. 5384-95.

**(b)** Transfer of production to Cheshire. BAE misrepresented its plan to transfer T100 production to Cheshire by telling Gyrodata that it would build up an inventory of T100s, maintain parallel lines and keep program management and engineering authority at Westlake. EA 313, p. 6173; EA 315, pp. 6178-80; EA 205, p. 3355; Uttecht Decl., ¶¶ 43, 50-51 (EA 11, pp. 875-76, 879-80). BAE's own employees admit these statements were lies. Casparro Tr. (10/20/09), 188:23–189:7 (representations were "a lie"), 199:17-20 ("documents … were written that I felt were fraudulent."); Hoffman Tr. (11/11/09), 161:2-23;162:1-4; 178:11-23 (no inventory buildup). Gyrodata did not learn the truth until its March 2, 2006 visit to Cheshire.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOSANGELES, CALIFORNIA 90071

Uttecht Decl., ¶¶ 54-55 (EA 11, pp. 881-82).

Delays did occur in 2005, but breaches of contract do not disclose fraud. *See Garter-Bare Co. v. Munsingwear Inc.*, 723 F.2d 707, 713 (9th Cir. 1984) ("No authority … supports [the] contention that notice of the violation of one's contract … triggers a duty to inquire as to possible fraud under … C.C.P. § 338(4).").

(c) Original T70 design/August 2005 presentation. After BAE's initial design failed, BAE told Gyrodata that "we are working on a plan for the next step in the development program." EA 204, p. 3349. On August 23, 2005, Defendants promised "THE Solution!" EA 397, p. 7225. BAE represented that "[t]he new suspension design will meet the Gyrodata MWD performance goals." EA 397, p. 7211; P270-74; *see also* Uttecht Decl., ¶ 59 (EA 11, pp. 884-85). BAE delivered a glowing presentation that convinced Gyrodata that the T70 program was back on track, altering the presentation to hide development problems and continued risks. *Compare* EA 397, pp. 7209-37, *with* EA 396, pp. 7186-7207; Uttecht Decl., at ¶¶ 54-62 (EA 11, pp. 881-887). BAE never disclosed that Cheshire was incapable of doing development work or that BAE planned to lay off the remaining engineers in Wayne. EA 388, p. 7164; Uttecht Decl., ¶ 66(b)-(d) (EA 11, pp. 1224-26, 28, 30). Gyrodata finally discovered BAE's fraud when AIS requested another $2 million dollars to complete the T70 project in February 2008. Uttecht Decl., ¶ 70 (EA 11, pp. 892-93). The discovery rule precludes summary judgment.

3. <u>The Defendants are estopped from claiming limitations</u>

A defendant is estopped to assert limitations "if the defendant's conduct, relied on by the plaintiff, has induced the plaintiff to postpone filing the action until after the statute has run." *Mills v. Forestex Co.*, 108 Cal. App. 4th 625, 652 (Cal. App. 2003); *Langdon v. Langdon*, 47 Cal. App. 2d 28, 31-32 (Cal. App. 1941). Estoppel is a fact question. *Mills*, 108 Cal. App. 4th at 652.

Gyrodata relied on BAE's false promises to delay filing suit. BAE met with Gyrodata in June 2006 and offered concessions to avoid a lawsuit. EA 331, p. 6232-

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

33. In December 2006, BAE admitted internally that it had sought to keep Gyrodata from filing suit. EA 35, p. 1488 ("[Gyrodata] threatened to sue us … Siegel got involved and quelled that to some extent."). BAE's promises of continuing performance persuaded Gyrodata not to seek legal remedies. Uttecht Decl., ¶¶ 61-65 (EA 11, pp. 885-88); EA 419, pp. 7544-46. Allowing Defendants to run out the clock when their own lies, concealment and delays caused Gyrodata to postpone filing suit would be unjust.

4. <u>What matters is when continuing conduct *ends*, not when it begins</u>

"[W]hen a tort involves continuing wrongful conduct, the statute of limitations doesn't begin to run until that conduct ends." *Flowers v. Carville*, 310 F.3d 1118, 1126 (9th Cir. 2002); *see also Tiberi v. CIGNA Corp.*, 89 F.3d 1423, 1431 (10th Cir. 1996) (reversing summary judgment in light of continuing torts).

Defendants engaged in a continuing series of fraudulent acts and omissions that continued well past December 1, 2005. *See supra*, Response at 34-36. BAE Systems' executives formulated, refined and implemented Project Crossroads on an ongoing basis, well into 2007. *Id.*; EA 160, p. 3047 (BAE Systems, Inc. initiated Project Crossroads); Siegel Tr. (11/16/09), 46:21–49:3 (same); EA 23, p. 1461; *see also* P270-80. By 2007, the T100 line looked like a "refugee camp." EA 64, p. 1819. By January 2008, BAE's cuts had stripped Inertial of the ability to perform even *customer-funded* development. EA 296, pp. 6050-71. It is impossible to break Project Crossroads into all of its specific acts and decisions for limitations purposes. Fact disputes exist regarding the nature, timing and extent of Project Crossroads, how the cuts impacted the programs and Defendants' continuing fraud.

## VIII. <u>BAE DEFENDANTS' ISSUE EIGHT: PLAINTIFF'S FRAUD CLAIM AGAINST THE BAE DEFENDANTS IS BARRED</u>

In addition to the economic loss rule[33] and statute of limitations, Plaintiff's

[33]Gyrodata cites no law for the proposition that a parent corporation cannot rely on the economic loss doctrine based on a subsidiary's contract, where the fraud allegations against the parent restate the breach of contract claim against the subsidiary. A party does not have to have a contractual relationship to assert the

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

fraud claim should be dismissed as to the BAE Defendants as a matter of law for failure to provide any competent evidence of a duty independent of the T70 and T100 contracts, let alone intent, or justified reliance on any misrepresentation by any BAE defendant -- all required elements to sustain a fraud claim. In sum, Plaintiff fails to offer competent proof of "who, what and when" for *any* BAE Defendant as to any *intentional* misrepresentations or omissions about T70 development or T100 deliveries, and how it was damaged directly by any such misrepresentation. *See Tok Cha Kim v. CB Richard Ellis Hawaii, Inc.*, 2008 WL 2610274, at *3 (9th Cir. 2008); *2156 Stratford Circle LLC v. AIG, Inc., et al*, 2012 WL 29411, at *12-13 (Cal. App. 2d Dist. 2012). Plaintiff cannot proceed on a fraud claim by generalizing that all three BAE Defendants "must have been" involved in AIS' misrepresentations. *See U.S. ex rel Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 523-24 (E.D.Pa. 2010).

The fraud count (Count III) names only one representative -- Carol Marinello -- but undisputed competent evidence demonstrates that she was an employee of BAE Inertial (now AIS), not any BAE Defendant. (D129, EA481, pp. 8415-20). Plaintiff offers no evidence showing that *any* BAE Defendant directed Ms. Marinello to make any misrepresentations to Gyrodata (or that she did anything other than promise AIS' contractual performance, which is not actionable as fraud).[34] Besides Greg White, all

---

economic loss doctrine. *Allied Fire & Safety Equip. Co., Inc. v. Dick Enterprises, Inc.*, 972 F. Supp. 922, 938 (E.D. Pa. 1997); *Annett Holdings, Inc. v. Kum & Go, L.C.*, 801 N.W.2d 499, 504 (Iowa 2011). California courts apply the economic loss rule to bar claims against a parent, even when it is not a signatory to the subsidiary's contract. *Federal Deposit Ins. Co. v. LSI Appraisal, LLC*, 2011 WL 5223061, at *6 (C.D. Cal. Nov. 2, 2011); *Federal Deposit Ins. Corp. v. Corelogic Valuation Services, LLC*, 2011 WL 5554324 (C.D. Cal. 2011); and *Countrywide*, 660 F. Supp. 2d 1163. *Legal Additions LLC v. Kowalski*, 2010 WL 1999894 (N.D. Cal. 2010) is inopposite -- the case dealt with an *individual* defendant that committed a wrong independent of the contract. Courts bar fraud claims against individuals and corporations alike where there is no evidence of a wrong *independent* of the subsidiary's breach of contract. *See AIG*, 2012 WL 29411, at *16; *Northern Natural Gas Co. v. Superior Court*, 64 Cal.App.3d 983, 991, 134 Cal.Rptr. 850, 855 (Cal. App. 1976).

[34] Gyrodata fails to present evidence of fraudulent intent sufficient to overcome summary judgment. *Netbula, LLC v. BindView Dev. Corp.*, 516 F.Supp.2d 1137 (N.D. Cal. 2007). The attempt to turn this case into some sort of conspiracy theory where a finance executive (i.e., Controls' Greg White) conspired with T70/T100 workers (e.g., AIS' Rich Gerber or Carol Marinello) to keep "secret Westlake closure"

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

other individuals identified by Gyrodata as involved in the alleged fraud were BAE Inertial's employees or representatives, and most of them continued to work for AIS in 2007 after BAE Inertial was sold. (D131-9, EA484, pp. 8469, 8490-91, EA481, pp. 8415-20 , EA2, pp. 11-12, 161-2).[35] BAE Inertial was sold and is now AIS, not BAE -- no BAE Defendant has dealt with Gyrodata since August 2007. (D142, EA2, pp. 10-11, 18). Besides the unsupported and time barred claim that BAE's Greg White had predetermined plans to close the Westlake facility before May 2003, the SAC fails to identify any fraudulent act or omission by any BAE defendant. (D140-41, EA481, p. 8408).[36] Thus, Plaintiff's fraud claim should be dismissed against the BAE defendants -- not only because it is untimely and barred by the economic loss rule -- but also because Plaintiff fails to allege with particularity the elements of a fraud claim as to any BAE Defendant.[37]

**PLAINTIFF'S RESPONSE: EACH NAMED BAE DEFENDANT IS LIABLE FOR FRAUDULENT ACTS AND OMISSIONS**

California law imposes broad duties not to lie, conceal, make false promises or engage in deceit. CAL. CIV. CODE § 1572-73, 1709-10; *Hynix Semiconductor Inc. v.*

---

plans from Gyrodata is mere fantasy, which requires dismissal. *See Dafasso v. Gen. Dynamics C4 Systems, Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011).

[35]Gyrodata's new claim that Lee Gwyn and Shlomo Kanner were also involved in the fraud, (D136), should be disregarded in light of its late identification and failure to identify any specific misrepresentations allegedly made by these individuals. *Netbula*, 516 F. Supp. 2d at 1153. In any event, Mr. Kanner was employed by BAE Inertial. (D137-39, EA2, pp. 161-2). Mr. Gwyn worked for BAE Systems Aircraft Controls (not a named Defendant) and was only involved with the project for several months in 2005. (*Id.*) Plaintiff's argument that Dan Bonsick, as BAE's 30(b)(6) witness cannot present the list of which entity each employee worked for is unsubstantiated and ignores the law on 30(b)(6) witnesses. *QBE Ins. Corp. v. Jorda Enterprises, Inc.*, 277 F.R.D. 676 (S.D. Fla. 2012).

[36]This claim is not only false but also time barred. The facts show that BAE did not have predetermined plans to close Westlake in 2003. (See D141, EA2, p. 14,, 114-117; *see also* White Tr., 180:7-13).

[37]Gyrodata's witnesses, four former engineers in Westlake, including George Hoffman and Dan Golden, could not articulate any fraud perpetrated on Gyrodata. (D143-4, D146, Casparro Tr. 12/19/11, 76:22-83:17, 149:4-6, Persico Tr. 1/04/12, 47:18-22, Golden 1/06/12, 146:10-148:16, 221:22-222:16, Hoffman Tr. 12/15/11, 233:8-20, 277:5-17). Gyrodata still fails to do so in opposition to this motion.

*Rambus Inc.*, 441 F. Supp. 2d 1066, 1075 (N.D. Cal. 2006). "Actual fraud is always a question of fact." CAL. CIV. CODE § 1574.[38] Each BAE Defendant is liable for fraud committed by its employees or by agents acting on its behalf who were employed by other BAE entities. *Inter Mountain Mortg., Inc. v. Sulimen*, 78 Cal. App. 4th 1434, 1441-42 (2000) (reversing summary judgment — questions of fact on employee/agent status); CAL. CIV. CODE §§ 2299-2300.

Each BAE Defendant knew of the fraud, lied, hid the truth, made false statements about schedules, recovery plans, capabilities of Cheshire and Wayne, and concealed ongoing cuts, closures and other material facts. *See* Uttecht Decl., ¶¶ 47, 52-72 (EA 11, pp. 877-78, 880-94); Klopp Decl., ¶¶ 40-45, 27, 29, 37 (EA 8, pp. 841-44, 837-38, 840); Brosnahan Decl., ¶¶ 31-32, 35-36 (EA 3, pp. 646-47, 648); EA 364, pp. 6591 *et seq.*; P248-P325, P365-97. Managerial employees of Controls, IESI and Inc. were responsible. Esparza Decl., Ex. A, Tabs 1-16 (EA 502, pp. 8670-6).

White and Siegel were VPs for BAE Systems Controls, Inc. P210L, N. Marinello wore multiple hats for "E&IS" (BAE Systems Inc.'s business name) and "Platform Solutions" — "*above* the … Inertial Products level." Marinello Tr. (11/20/09), 271:7-16; Esparza Decl., Tab 3 (EA 502, p. 8693); EA 128, p. 2508. All three knew BAE could not "maintain a significant engineering staff for development work," but Siegel and Marinello told Gyrodata precisely the opposite. EA 438, pp. 7677-79; Uttecht Decl., ¶¶ 52-68 (EA 11, pp. 880-92). Siegel promised that T70 work would be completed, development engineers in Cheshire and Wayne were fully capable, and they were giving the matter a high priority. Uttecht Decl., ¶¶ 58, 66 (EA 11, pp. 883-84, 888-89). Internally, BAE admitted that "we cannot do development in Cheshire," EA 388-89, pp. 7164-68, the Cheshire group was cut in half and was so understaffed it could not do development work, EA 437, pp. 7662-75; EA 11, pp.

---

[38] Conflicting evidence of agency presents a fact question for the jury. In addition to the specific proof attached to the Esparza Declaration, BAE operated as a single integrated company rather than through separate legal entities. P211A-F. Most BAE employees did not even know which entity employed them. P215-217; Esparza Decl. (EA 502). Gyrodata incorporates all proof from Issues 3, 6 and 8. P248-P397.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOSANGELES, CALIFORNIA 90071

1150-65; EA 2, pp. 603-04; EA 385, p. 7127; EA 439, pp. 7681-84, and the few development folks left were "*close to giving up and bailing out*," EA 419, 7544. E&IS accountants reported that "*next to no work was done*," EA 424, pp. 7584-85, and testing was given "*no priority*," EA 421, pp. 7577-78; EA 391-94, pp. 7173-80; EA 419, p. 7546; EA 423, p. 7582; EA 434, p. 7649; Uttecht Decl., ¶ 67 (EA 11, pp. 889-91).

Marinello's representations were "a lie." Casparro Tr. (10/20/09), 188:23–189:7, 199:17-20. Program manager Tim Anderson (Platform Solutions) was rated "unacceptable," but Gyrodata was told the opposite. Uttecht Decl., ¶ 64(EA 11, p. 888); EA 154, p. 2979. Marinello and Lee Gwyn (E&IS program manager) doctored an August 2005 presentation to make it appear that the prototypes were just around the corner when they knew the opposite was true. Uttecht Decl., ¶¶ 57-65 (EA 11, pp. 882-88); EA 131-32, pp. 2537-40. Shlomo Kanner (BAE Systems NA Controls and E&IS project leader) admitted the company was lying: "***we have not owned up to Gyrodata that the plans are to RIF the people in Wayne that … just picked up the responsibility from Westlake. If you disclosed this, they may conclude … we … can't accomplish the development and … demand the IP***." EA 395, pp. 7182-84; EA 17, p. 1400; EA 87, pp. 2028-29. Ted McDonough (E&IS) knew T70 was getting low priority and Cheshire was incapable, but BAE told Gyrodata the opposite. Uttecht Decl., ¶¶ 65-67 (EA 11, pp. 888-91); McDonough Tr. (12/22/09), 164:20–165:12, 274:12–275:13. Ethics complaints made in March 2006 were not disclosed or investigated. P307. Siegel carefully orchestrated presentations because "when we're in this kind of trouble, subtle impressions can make a difference." EA 409, pp. 7508-09. There is ample evidence of fraud by each Defendant. Uttecht Decl., ¶¶ 52-72 (EA 11, pp. 880-94).

## IX. <u>BAE DEFENDANTS' ISSUE NINE: PLAINTIFF FAILS TO ESTABLISH KEY ELEMENTS REQUIRED FOR TORTIOUS INTERFERENCE CLAIMS</u>

Gyrodata claims that the restructuring of Inertial Products' business through

consolidating multiple legacy manufacturing and engineering facilities tortiously interfered with its T100 (Count IV) and T70 (Count V) contracts. However, such allegations fail to meet the intent and causation requirements for tortious interference claims, which is additional grounds for dismissing these counts.

Courts consistently dismiss tortious interference with contractual relations claims in the absence of competent evidence to demonstrate an *intentional* interference with a contract and/or where there is no causation between the alleged interfering conduct and the breach. *See Heheman v. E.W. Scripps Co.*, 661 F.2d 1115, 1127-28, rehearing denied 668 F.2d 878, certiorari denied 456 U.S. 991, 102 S. Ct. 2272 (1982); *LucasArts Entm't Co. v. Humongous Entm't Co.*, 870 F. Supp. 285, 291 (N.D. Cal. 1993); *Eforce Global, Inc. v. Bank of America, N.A.*, 2010 WL 2573976, at *9-10 (N.D. Cal. 2007); *Wynn v. Nat'l Broadcasting Co., Inc.*, 234 F. Supp. 2d 1067, 1121-22 (C.D. Cal. 2002). Gyrodata's position that it does not have to prove intentional harm or causation for a tortious interference claim (GD Br. 25) is wrong as a matter of law.

But even were Gyrodata able to show some intent to interfere, which it has not done in this case, BAE Defendants were privileged to interfere for economic reasons. The evidence set forth in the Bonsick Declaration shows that the decision to consolidate BAE Inertial's legacy production and engineering facilities, resulting in the transfer of T100 production in 2003, and the later decision to close Westlake in 2005, was economically justified based on the need to streamline operations in the face of declining sales and loss of business. The corporate documentation shows that there was no intent to harm Gyrodata, but rather to address the business reality of contracting sales -- in 2005, a 39% decline in sales from 2003 to 2006 was projected, as BAE Inertial lost critical production contracts in Westlake and other facilities. (D160-162, 166, EA2, p. 15-16, 492).

Gyrodata does not offer any admissible evidence in opposition to show that any BAE Defendant sought to *intentionally* induce a breach of the T70 contract or T100

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

purchase orders. It does not show how any of its alleged damages were caused by the alleged interference. (*See supra*, issue 2) Plaintiff also fails to show that its tortious interference claims were timely filed under the applicable statute of limitations (*see supra*, issue 7). These independent reasons mandate dismissal of Counts IV and V against the BAE Defendants. In addition, the evidence shows that BAE Defendants acted for valid and justifiable economic reasons and that BAE Inertial implemented specific plans in late 2005 for Gyrodata's benefit to continue T70 development and T100 production at the Cheshire and Wayne facilities, even though Gyrodata no longer funded T70 work. (D174-179, EA2, pp. 11-12, 17, 163-65, 614-619, EA338, p. 6292, EA337, pp. 6265-6290, EA212, pp. 3373-3375, EA329, pp. 6223-6224, EA185, p. 3247, EA340, pp. 6297-6333, EA468, pp. 8052-4). This is a fourth and final reason for dismissal of Count IV and V.

**PLAINTIFF'S RESPONSE: BAE'S INTERFERENCE WAS INTENTIONAL AND NOT PRIVILEGED**

Under California law, "intentional" interference may be inferred from conduct substantially certain to interfere with an existing contract. *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55-56 (1998) (actionable even when interference is incidental to actor's independent purpose and desire but known to be a necessary consequence of his actions); *see also Bank of New York v. Fremont Gen. Corp.*, 523 F.3d 902, 909 (9th Cir. 2008). To establish causation, an act need only be a "substantial factor" leading to harm. *Fremont*, 523 F.3d at 909-10. A parent company has the burden to prove that its interference with a subsidiary's contract was privileged. *Culcal Stylco, Inc. v. Vornado, Inc.*, 26 Cal. App. 3d 879, 882 (1972); *Woods v. Fox Broad. Sub., Inc.*, 129 Cal. App. 4th 344, 350-51 (2005).

BAE bought Condor in December 2002 for $57 million and re-sold it in August 2007 for $140 million — hardly the signs of a struggling company. ECF No. 233 at 8; EA 2, pp. 626-9. In fact, before Project Crossroads, Inertial was projected to earn $111 million of profit between 2006 and 2011. White Tr. (12/8/09),

86:8–87:14. BAE demanded and directed the cuts, however, hoping to enrich itself to the *tune of an additional $20 to $30 million*. *Id.* at 104:13–105:12.

BAE knew that closing Westlake, cutting Cheshire personnel by around 20% and gutting the Wayne group would: (1) cause "irrevocable harm to [Inertial's] engineering capacity;" (2) significantly and adversely affect current programs, including Gyrodata's T70; and (3) delay deliveries of T100 gyros to all. EA 11, p. 1165 ("irrevocable harm to our engineering capacity"); EA 278, pp. 5386-95 ("key engineering support to the T100 production line, T70 development, and systems design will be lost"); EA 95, p. 2307 ("likely to lose Gyrodata"); EA 167, p. 3127 (cuts "would decrease the value of IP"); EA 95, p. 2307 ("staffing levels are driven to meet financial model, but is less than required to execute programs"); Casparro Tr. (10/20/09), 207:21–208:7 (the "silliest move that BAE ever made."). BAE's decision to move forward with the cuts, knowing these risks, is not privileged. *See Phil Crowley Steel Corp. v. Sharon Steel Corp.*, 782 F.2d 781, 784 (8th Cir. 1986) (improper purpose to harm the subsidiary to "make more money").

These heavy cuts clearly caused the breach of Gyrodata's contracts. *See also* EA 58, p. 1771 (as BAE put Inertial into "harvest mode," there was a severe shortage of four different types of engineers); EA 64, p. 1819 (by 2007, T100 assembly area looked like a "refugee camp"). In 2008, AIS blamed its lack of resources on the restructuring. EA 296, pp. 6050-71 ("Consolidation of U.S. facilities and Business Divestiture … minimize[ed] U.S. engineering investment and resources."). Whether the inference was known to be a necessary consequence of the restructuring, a substantial factor in Gyrodata's harm, and justified under all the circumstances are issues properly left to the jury.

**PLAINTIFF GYRODATA'S MOTIONS FOR SUMMARY JUDGMENT**

Gyrodata is entitled to summary judgment on AIS's declaratory judgment counterclaim and all defenses based on alleged use of proprietary data.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

## I. PLAINTIFF'S ISSUE A: BAE/AIS'S "STANDARD TERMS AND CONDITIONS" ARE NOT PART OF THE T-100 SALES CONTRACTS OR T-100 REPAIR-PARTS CONTRACT

Defendants contend that Gyrodata violated BAE/AIS's Standard Terms and Conditions (ST&Cs) by repairing and replacing the suspension in T-100 gyroscopes and seek $66 million in profit made from services provided using the repaired units. Defendants also rely on the ST&Cs as the sole basis for "limitation of liability" defenses[39] to Gyrodata's damages for breach of the T-100 contracts and as part of the predicate for BAE's "setoff" and "unclean hands" defenses. Gyrodata is entitled to judgment on all counterclaims and defenses that rely upon the ST&Cs because they are not part of the T-100 sales contracts or T-100 repair-parts contract.

Gyrodata asserts breach of six T-100 sales contracts. ECF No. 108 (EA 481, pp. 8401-25. Purchase Order 201520 was accepted by BAE without any reference to ST&Cs, and no ST&Cs were sent to Gyrodata in response to that purchase order. EA 383, p. 7109; P36. BAE/AIS accepted Purchase Orders 61010, 61121, 61420, 61706 and 61993 conditioned upon Gyrodata's assent to BAE/AIS's ST&Cs. EA 355-56, pp. 6422-38; EA 359-60, pp. 6461-76; EA 362, pp. 6481-87; P6,[40] 8, 11, 13, 15; *see also* Defs.' Resp. to P26-30. BAE/AIS never sought or received Gyrodata's written or oral assent to the ST&Cs. Uttecht Decl., ¶ 14; P16-25. At no point did BAE/AIS require Gyrodata to accept the ST&Cs. Uttecht Decl., ¶ 14 (EA 11, p. 862); P26-30. Gyrodata never signed the ST&Cs in connection with sales of T-100 gyroscopes. P31, 38, 40.

---

[39] AIS has not pled contractual limitation of liability and has therefore waived this affirmative defense. *See* AIS's Second Am. Countercl., ECF No. 173 (EA 473, pp. 8197-8217) ("SACC"), ¶¶ 25-52; *Kerry, Inc. v. Lakeland Cold Storage, LLLP*, No. 8:10-cv-2209-T-27MAP, 2011 WL 2038549, at *2 (M.D. Fla. May 24, 2011) (contractual limitation of liability is an affirmative defense); FED. R. CIV. P. 8(c)(1). The *Taylor* decision cited by Defendants merely involved a statutory limit on damages intrinsic to the Plaintiff's case, not a *contractual* limitation of damages which would be an affirmative defense. 821 F.2d at 1428, 1432-33.

[40] Defendants frequently admit the gist of admissions requested but add "helpful" irrelevant facts and call them "disputed." Where this occurs, Gyrodata points to the SUF where the actual facts are stated so the Court can utilize the admitted portion of the request. Gyrodata incorporates Plaintiff's SUF entries and proof in full.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOSANGELES, CALIFORNIA 90071

No ST&Cs apply to Purchase Order 201520 because BAE accepted it without any reference to its ST&Cs. EA 383, p. 7109; P36. As to the remaining five purchase orders, California Commercial Code section 2207 sets out three mutually exclusive paths to the formation of a contract.[41] If a buyer's purchase order contains terms A, B and C and the seller's acceptance contains terms A, B, C, D and E, the parties have formed a contract containing terms A, B and C; terms D and E become proposals for additions to the contract (Path #1). *Diamond Fruit Growers, Inc. v. Krack Corp.*, 794 F.2d 1440, 1443-44 (9th Cir. 1986). However, the rules are different if the seller expressly conditions its acceptance on the buyer's assent to terms D and E. If the buyer specifically assents to terms D and E, then the parties have a contract containing terms A, B, C, D and E (Path #2). *Id*. On the other hand, if the buyer does *not* assent to terms D and E but the parties proceed as if they have a contract, their *conduct* forms a contract consisting of the terms on which the parties' writings agree (A, B and C) plus any "gap filler" terms supplied by the Uniform Commercial Code (Path #3). *Id*.

In our case, BAE/AIS's acceptances of P.O. 61010, 61121, 61420, 61706 and 61993 were expressly conditioned upon Gyrodata's assent to the ST&Cs. EA 355-56, pp. 6422-38; EA 359-60, pp. 6461-76; EA 362, pp. 6481-87; P6, 8, 11, 13, 15; *see also* Defs.' Resp. to P26-30. Thus, Path #1 does not apply.

Path #2 applies only if Gyrodata assented to the ST&Cs. Gyrodata never expressly assented to the ST&Cs. Uttecht Decl., ¶ 14 (EA 11, p. 862); P16-25, 31, 38, 40. Further, Gyrodata's silence, receipt and use of the T-100s and receipt of numerous copies of BAE/AIS's ST&Cs over time do not constitute assent to the ST&Cs as a matter of law. *See, e.g., Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 788-89 (9th Cir. 2001); *Diamond Fruit*, 794 F.2d at 1445; *Transwestern Pipeline Co. v. Monsanto Co.*, 46 Cal. App. 4th 502, 513 n.1 (Cal. App. 1996).[42]

---

[41] The parties stipulate that California law applies. *See* P144.

[42] Defendants discuss the procedural posture of all three opinions but do not and cannot ultimately dispute the rule of law they establish—repeated ordering and

Defendants' claim that Gyrodata's "performance" constitutes "express assent" therefore fails.[43]

Lacking evidence of express assent, Defendants' claim that Gyrodata's use of "several" RMA forms to obtain conforming gyroscopes substitutes for it. This raises no genuine dispute of material fact. Gyrodata had the right under the Uniform Commercial Code to fit and merchantable gyroscopes; its insistence on them gave no assent to ST&Cs giving it lesser rights. CAL. COMM. CODE §§ 2314, 2315. The RMAs do not mention the ST&Cs at all, much less adopt them, and BAE explained that they were merely tracking forms. Brosnahan Decl., ¶¶ 26-28 (EA 3, pp. 645-46). Gyrodata sent in at least 25 T-100s for repair or replacement without an RMA, and BAE accepted and repaired or replaced them. *Id.*, ¶ 26 (EA 3, p. 645). The Gerber declaration asserting that Gyrodata assented to the ST&Cs is a sham: Gerber knew that Gyrodata had rejected BAE's attempts to impose payment terms found in the ST&Cs and complained bitterly about it. *Id.*, ¶ 29 (EA 3, p. 646); Gerber Tr. (12/3/9), 146:9–147:3. Finally, Defendants' cases are inapposite. In *Twin Disc*, the issue of assent was a "close one" even though—unlike here—the buyer had actual knowledge of the warranty, invoked it 210 times, and *expressly told its customers to contact the manufacturer on its warranty*. *Twin Disc*, 772 F.2d at 1334-35. Further, the Ninth Circuit disregarded *McKenzie* as of "little precedential value because the court provided no analysis to support its decision." *Diamond Fruit*, 794 F.2d at 1444 n.6. Defendants cannot point to a single word or deed from Gyrodata that even arguably indicates that Gyrodata assented to the *limited warranty provisions* of the ST&Cs, much less any of the other provisions thereof.

Thus, Path #2 does not apply to P.O. 61010, 61121, 61420, 61706 and 61993.

acceptance of product is not assent.

[43] *Bowen* and *Craig Wireless* stand for the unremarkable proposition that the parties' course of *performance* under a contract can create fact issues concerning the *meaning* of that contract. In our case, the determinative portions of the parties' course of performance under the T-100 contracts are undisputed and establish that Gyrodata did not impliedly assent to the ST&Cs under the rationale of the *Textile Unlimited*, *Diamond Fruit*, and *Transwestern Pipeline* decisions cited above.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

However, BAE/AIS and Gyrodata formed contracts by conduct per Path #3. They consist of "those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this code." CAL. COMM. CODE § 2207(3). The ST&Cs are neither agreed written terms nor Uniform Commercial Code "gap filler" provisions. They are therefore not part of the T-100 contracts between the parties. Consequently, the parts of the SACC and affirmative defenses such as limitation of liability, setoff and unclean hands which are premised on the ST&Cs fail as a matter of law, and summary judgment is thus appropriate.

**DEFENDANTS' RESPONSE: DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON WHETHER THE ST&CS ARE PART OF THE T100 CONTRACT**[44]

Under the UCC, when acceptance of an offer is expressly made conditional on the offeror's acceptance of additional terms, the additional terms become part of the contract if the offeror assents to them. CAL. COM. CODE 2-207(1). Although Gyrodata implies that a counter-signature is required to establish assent, there is no clear legal authority for Plaintiff's position where the material facts pertaining to Plaintiff's assent are disputed.[45] Courts have held that a party's performance pursuant to the additional terms constitutes express assent to them. Here, Gyrodata performed according to and availed itself of the benefits of the ST&Cs. D274, EA005, ¶18. For instance, Gyrodata took advantage of the warranty provisions

[44] Contrary to Gyrodata's Motion, AIS's counterclaim and BAE's "setoff" and "unclean hands" defenses are not intertwined and are not based solely on the ST&Cs. Although Gyrodata seeks dismissal of "all defenses," it does not identify which of BAE's thirty-six defenses it seeks to dismiss, if any, besides setoff and unclean hands defenses. As set forth below, Defendants' setoff and unclean hands defense are both broader than the ST&Cs. Plaintiff cannot obtain dismissal of any other defenses without identifying which ones it seeks to dismiss. Plaintiff's motion is also procedurally improper -- pursuant to the Court's summary judgment order, Plaintiff cannot "incorporate [its] SUF entries and proof in full" (Gyrodata's Br., fn 40) and any alleged facts not specifically cited in the brief are deemed irrelevant.

[45] The cases cited by Gyrodata are distinguishable. Here, Defendants dispute the critical facts, *see* Opp. to P16-P30 and D274, EA005, ¶18. In both *Diamond Fruit Growers*, 794 F.2d 1440 and *Transwestern*, 46 Cal. App. 4th 502, the Courts were not deciding whether there were disputed facts on summary judgment. The courts in *Transwestern* and *Textile Unlimited* expressly stated that facts pertinent to the analysis were undisputed, which is not the case with respect to Gyrodata's motion.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOSANGELES, CALIFORNIA 90071

contained in the ST&Cs for several of the disputed purchase orders. Opposition to P16-P30; D274, EA005, ¶18. The Seventh Circuit has held that such conduct constitutes express acceptance of additional terms as a matter of law. *Twin Disc, Inc. v. Big Bud Tractor, Inc.*, 772 F.2d 1329, 1334-35 (7th Cir. 1985). Similarly, Gyrodata utilized the Return Merchandise Authorization procedures in the ST&Cs when submitting warranty returns, further indicating express acceptance of those terms. D274, EA005, ¶18; *see also McKenzie v. Alla-Ohio Coals, Inc.*, 1979 WL 30087 (D.D.C. 1979) (express assent to additional terms found when offeror performed in accordance with additional terms).[46] Under these circumstances, the (disputed) question of whether Gyrodata assented to the additional terms by its conduct renders the issue inappropriate for resolution on summary judgment. *State v. Bowen*, 710 F. Supp. 739, 745 (E.D. Cal. 1989) (course of dealing over time entails factual questions regarding assent which defeat summary judgment); *see also Craig Wireless Sys. Ltd. v. Clearwire Legacy LLC*, 2011 WL 4011415, at *11 (W.D. Wash. 2011).

## II. PLAINTIFF'S ISSUE B: NO "SEPARATE AGREEMENT" PROHIBITS GYRODATA FROM REPAIRING OR MODIFYING T-100S

AIS tries to dodge the fact that the ST&Cs were never approved by *alleging* a "separate" *oral* agreement requiring a license to repair or modify T-100s. SACC, ¶ 42 (EA 473, p. 8206). Gyrodata never signed or agreed to any restriction on its right to repair, modify or manufacture T-100s. Uttecht Decl., ¶ 9 (EA 11, p. 861); Klopp Decl., ¶ 6 (EA 8, pp. 829-30; Brosnahan Decl., ¶ 2 (EA 3, p. 638). AIS corporate representative Chris Holmes had "no knowledge" of any additional agreement and could not identify any writing memorializing it.[47] Holmes Tr.

[46] Gyrodata's claim that contractual limitation of liability is an affirmative defense that must be pleaded is unsupported by California law. *Taylor v. U.S.*, 821 F.2d 1428 (9th Cir. 1987), cert denied, 485 U.S. 992.

[47] Holmes disclaimed knowledge of any separate agreement, did not join AIS until 2007, and his "rebuttal report" discusses industry standards rather than facts based on personal knowledge showing an *agreement* by Gyrodata. FED. R. EVID. 602.

(12/9/09), 157:24–158:6, 159:4-7, 160:3-8, 161:6-11. Art Siegel (BAE VP) conceded "There is nothing today which prevents Gyrodata from repairing their own gyros and selling them to anyone they please, or selling their failed gyros to a third party who might repair and re-sell," EA 418, pp. 7541-42, and agreed "there is really nothing to stop Gyrodata from contracting with others to do these repairs" EA 417, pp. 7535-39. AIS cannot create a fact issue by contradicting its 30(b)(6) designee, president, and VP. *Great American Ins. Co. of N.Y. v. Vegas Constr. Co., Inc.*, 251 F.R.D. 534 (D. Nev. 2008); FED. R. CIV. P. 37(d). The response cites three *written* documents, but none apply: the T70 contract does not mention T-100s or repairs, the price quote is not an agreement approved by Gyrodata[48], and Gyrodata is not a party to Golden's nondisclosure agreement. None of the three purported contracts was pled by AIS or disclosed in interrogatory answers.[49] The Court denied AIS leave to plead interference with Golden's nondisclosure agreement, theft of trade secrets, or assert other counterclaims. ECF No. 294.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

**DEFENDANTS' RESPONSE: THREE OTHER CONTRACTS CONSTRAIN PLAINTIFF'S ABILITY TO MODIFY T100S**

Gyrodata's contention that "no one from Gyrodata ever signed or agreed to any restriction on Gyrodata's right to repair, modify or manufacture T100s" is incorrect. The evidence shows that Gyrodata is manufacturing new T100s with IP that was developed under the T70 contract. D224-D229, D264, EA471, p.8172-74; EA291, p.5994. Gyrodata signed the T70 contract, which provides that AIS owns the T70 IP. D180, EA 308, p.6149. Thus, AIS owns the IP with which Gyrodata is modifying T100s, including the Cross-Leaf Suspension design. D264, D282-D283, EA __, p.. Gyrodata's argument relies on mischaracterizations of Mr. Siegel's email and Mr.

[48] *See infra* Gyrodata's Mot. regarding waiver.

[49] AIS pled no counterclaim for breach of the T70 contract, Golden's nondisclosure agreement, or the price quote: paragraph 42 is limited by its terms to an agreement "*in connection with the sale of T100s*" that was "*initially oral.*" *See also* EA 448, p. 7816 (AIS Answer to Interrog. No. 9) (describing "*negotiations,*" "*understandings*" and "*drafts*" without citing any of the items argued in the response).

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOSANGELES, CALIFORNIA 90071

Holmes' testimony (as Plaintiff completely ignores Mr. Holmes' expert opinions offered in this matter). *Id.*, *see also* Opposition to P45-46, P69.

In addition, by agreement, AIS's sale of T100 repair parts to Gyrodata was "strictly for purposes of Gyrodata repairing model T-100 gyros and does not constitute . . . authorization to Gyrodata for the right to manufacture the model T100 gyro or the use of BAE Systems intellectual property related to the model T-100 gyro." D256, EA 328, p.6220. Finally, Dan Golden, Gyrodata's lead gyro engineer, is a party to a non-disclosure agreement ("NDA") that obligates him not to use confidential information of AIS, including information pertaining to the T100 and T70 IP. D213, EA 343, p. 6346. Mr. Golden was Gyrodata's source for obtaining the cross-leaf suspension design at issue. D214-D219, D221-D222, D263, EA 291, p.5991, 5995-97. Thus, Gyrodata's argument that there are no agreements specifically directed at limiting its ability to repair, modify or manufacture the T100s it purchased is erroneous.

## III. PLAINTIFF'S ISSUE C: GYRODATA CANNOT BE SUED FOR USING INTELLECTUAL PROPERTY IT OWNED

### 1. The "Proprietary Information" Gyrodata allegedly used was created during the T70 design effort

Defendants claim that while working for BAE on the T70, Dan Golden was involved in developing a "brazed" cross-leaf suspension. Gyrodata strongly disputes that Golden used any BAE proprietary information for Gyrodata, but even assuming *arguendo* that he did, Gyrodata had the right to use this data as a matter of law. Under the T70 agreement, Gyrodata was entitled to all data created in the T70 program if BAE was unwilling or unable to manufacture the sensor. EA 308, pp. 6146-51. All brazed cross-leaf suspension data was created as part of the T70 development. Golden Decl., ¶ 6 (EA 6, p. 705); P106.

### 2. Gyrodata owned rights to the T70 program data, including the brazed flexure design

The two principal negotiators of the T70 contract agree: if BAE was unable or unwilling to produce the T70, Gyrodata was licensed to use all technical drawings, designs and specialized tooling needed to set up a T70 manufacturing facility. Casparro Tr. (12/19/11), 172:1-12, 238:1-11, 248:6-15, 249:6–250:18; Uttecht Decl., ¶ 15 (EA 11, pp. 862-63); EA 308, p. 6149 at ¶ 5. BAE agreed with Gyrodata's interpretation of the contract in 2006 internal communications. EA 417, pp. 7535-39.

BAE was *unable* to produce the sensor from 2006 on and *unwilling* from 2008 forward. Hanse Tr. (1/13/12), 211:16-23; Holmes Tr. (1/20/12), 63:12-21; McDonough Tr. (12/22/09), 51:4-10; 303:19–304:4; EA 448, pp. 7801-26, Req. Admis. 16. A fact dispute can exist here only if Defendants are permitted to contradict their own clear testimony. *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). Gyrodata was entitled to use all technical drawings, dimensions and specifications accumulated in the T70 process. EA 308, p. 6149 at ¶ 5; Casparro Tr. (12/19/11), 249:11–250:18. BAE says that because it failed to "complete" the sensor, no assignment is due, but when a party prevents or makes impossible a condition precedent, the condition is excused. *Jacobs v. Tenneco West, Inc.*, 186 Cal. App. 3d 1413 (5th Dist. 1986). No "reasonable compensation" fact issue exists: BAE's right to a royalty was removed from the final T70 agreement, and compensation was due only if manufacturing set up services were ordered. EA 103, pp. 2367, 2369; Casparro Tr. (12/19/11), 251:25–253:25. The intellectual property under paragraphs 4 and 5 of the agreement was identical. Casparro Tr. (12/19/11), 224:24–225:12, 228:13–229:10. Assignment of the intellectual property for "the sensor" automatically conveys all trade secrets necessary for its operation, including its suspension. *Asset Mktg. Systems, Inc. v. Gagnon*, 542 F.3d 748, 758 (9th Cir. 2008) ("Gagnon granted AMS an implied, unlimited license to the programs software … AMS could not have misappropriated Gagnon's trade secret. … the license included access to any trade secret embodied therein.").

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOSANGELES, CALIFORNIA 90071

**DEFENDANTS' RESPONSE: GYRODATA NEVER OBTAINED RIGHTS TO T70 IP**

Gyrodata's argument that it was entitled to use all T70 IP if AIS stopped working on the program is contrary to the plain language of the T70 contract and overlooks key factual disputes, including testimony by Gyrodata's own witnesses. D180, D193, D248, D256, D285, D286, D287, EA 308, p.6149; Persico Tr. 1/04/12, 245:17-246:16; Golden Tr. 1/06/12, 129:10-131:8; Casparro Tr. 12/19/2011, 227:2-6. The contract "retains" to AIS all IP "associated with the sensor to be developed hereunder," and a license to Gyrodata is limited to "the manufacture, sale and use of the sensor" only at "completion of the development program," upon payment of mutually agreed "reasonable compensation." D180, EA 308, p.6149. First, there is a factual dispute over whether the development "program" was ever "completed," and if so, when and at whose instance. D285; Casparro Tr. 12/19/2011, 227:2-6. Thus, a condition precedent to the grant of a license did not happen. Second, the cross-leaf suspension design at issue is not the T70 sensor; it is associated with the sensor, but Gyrodata's license (even were it to obtain such a license) was to be limited just to the sensor. D286. Third, Gyrodata's contention that the license for all T70 IP takes effect whenever the development program ends, regardless if the sensor is developed, is nonsensical; how can Gyrodata's license to manufacture, sell and use "the sensor" take effect if no sensor is ever developed? Fourth, the parties did not mutually agree to reasonable compensation for a license, and Gyrodata did not pay for a license. D207; Persico Tr. 1/04/12, 244:6-246:16; Uttecht Tr. 12/23/11, 261:3-17; Opp. to P54. Finally, it is undisputed that Gyrodata was using IP in the "Alltech" suspension in 2006, and that the T70 program continued until early 2008. D241, D245-D246, EA 327, p. 6216-18; Golden Tr. 1/06/12, 265:20-266:8. Thus, even assuming arguendo that Gyrodata is correct that the end of the T70 program in 2007 triggered the license provision of the T70 contract, Gyrodata offers no theory that would permit

it to use T70 IP in 2006.[50]

## IV. PLAINTIFF'S ISSUE D: EVEN IF "SELLER'S TERMS AND CONDITIONS" APPLIED, THEY DO NOT LIMIT GYRODATA'S RIGHT TO REPAIR, REPLACE OR MODIFY THE T-100

The Declaratory Judgment Act cannot be used to "declare" restrictions that do not exist under the T-100 contracts themselves. *Christ v. Beneficial Corp.*, 547 F.3d 1292, 1299 (11th Cir. 2008). The words "repair," "modify," "license fee" or "other compensation" do not appear anywhere in the ST&Cs. P65-P68. BAE and AIS conceded in internal emails and testimony that Gyrodata has the right to repair its T-100 gyroscopes. P71, P73, P74; EA 418, pp. 7541-42; EA 417, pp. 7535-39; Hoffman Tr. (11/11/09), 129:8-20; Casparro (12/19/11) Tr., 277:1-25; Meltzner Tr. (1/28/10), 201:13-16.

A purchaser owns the product and has the right to repair, replace component parts and modify the product. *Surfco Haw. v. Fin Control Sys. Pty, Ltd.*, 264 F.3d 1062 (Fed. Cir. 2001). The response claims *patented* items may not be re-manufactured, but (1) the T-100 was *never patented* and (2) Gyrodata *never manufactured T-100s*. Hoffman Tr. (11/11/09), 183:20–184:4; Brosnahan Decl., ¶¶ 18, 22 (EA 3, pp. 643-44); Golden Decl., ¶¶ 3-5 (EA 6, pp. 703-05). Using proprietary information to *repair* T-100s or modify parts does not violate the ST&Cs as BAE wrote them. The "manufacturing" evidence AIS cites relates solely to MXY development - not the T-100 gyro. AIS has no declaratory relief claim for MXYG manufacture. AIS SACC (seeking declaratory relief for T-100 only); Golden Tr. (5/7/2010), 12:20-23 (EA 466, p. 8009) (AIS counsel stated on the record there is no claim proprietary information was used to develop the MXYG). Moreover, no ST&Cs were sent for hundreds of T-100s sold to Gyrodata from 1988 to 2004. P32, P107; Brosnahan Decl., ¶ 2 (EA 3, p. 638). By 2005, any Seller's data pertaining to

---

[50] Gyrodata's position that it was retroactively authorized to copy the suspension design in secret in 2006 is unsupportable, especially since Gyrodata's own witnesses admitted that AIS owned T70 IP at this point and that the designs at issue were proprietary to AIS. Persico Tr. 1/04/12, 245:17-246:16; Golden Tr. 1/06/12, 129:10-131:8.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

T-100 orders had been known for 15 years.

**DEFENDANTS' RESPONSE: THE ST&CS LIMIT GYRODATA'S RIGHT TO REPAIR OR MODIFY T100S**[51]

The ST&Cs provide that "Buyer agrees that it will not use Seller's data for the manufacture ... of products which are the subject of this Order or any similar products, … or reproduce said data and information or otherwise appropriate them without the written authorization of the Seller." D278. Contrary to Gyrodata's contention, whether or not Gyrodata has and is manufacturing T100s is disputed and precludes summary judgment. *See* Opp. to P97, D201, D261, D264, D266; EA 242, p. 4715. Defendant's experts have opined that AIS's proprietary data -- such as the mechanical design, calibration techniques, sealing and filling a gyro, and electronics -- is used to modify T100s and that Mr. Golden copied and used AIS's proprietary suspension design in T100 modifications. D224-D228, D263, D288. While Gyrodata alleges, without factual support, that AIS's T100 data, dimensions and tolerances are not proprietary, AIS disputes this claim and proffers factual support that this information is proprietary. EA ¶16, 32; Casparro Tr. 12/19/11, 179:8-20; *AIS v. New Condor* Meltzner Tr. 66:11-67:24. The trier of fact must weigh these disputes.

Gyrodata's next contention – that T100s were sold without limitation into the stream of commerce and could be reverse engineered - is academic. Gyrodata has never asserted that it reverse-engineered more than two dimensions of the T100, a highly complex instrument with many parts (D289), nor has it claimed that it received any data regarding the T100 from some other buyer who purchased the item and then

[51] Gyrodata misapplies the holding in *Christ v. Beneficial Corp.*, 547 F.3d 1292 (11th Cir. 2008). In *Beneficial Corp.*, the Court overturned an award of $22 million in restitution and disgorgement not because such fees can never be awarded under the Declaratory Judgment Act, but because appellee conceded that it could not prove its actual damages. Here, the matter is quite the opposite and, in any event, calculation of AIS's damages for Gyrodata's misuse of proprietary information is not the matter before the Court. *See, e.g., Pandora Jewelers 1995, Inc. v. Pandora Jewelry*, LLC, 2011 WL 915674 (S.D. Fla. 2011).

legitimately reverse-engineered it. *Id*., Opp. to P99. To the contrary, Gyrodata's expertise with T100s originates with Dan Golden, who was previously employed by BAE Inertial. D187-189, D192, D195, D214, D216-D217. The parties dispute whether Mr. Golden reverse engineered, rather than copied, any dimensions of the T100. D111.

Further, whether Gyrodata is actually "repairing," as opposed to manufacturing and marketing enhanced T100s as if they were its own new gyros that it developed and manufactured is also disputed. *See* Opp. to P97, D264, D266, EA 242, p. 4715. Gyrodata has offered no evidence that its activities constitute repair as opposed to Defendants' expert opinions that Gyrodata is actually remanufacturing T100s. (*See id*.) Summary Judgment is inappropriate under these circumstances.

Gyrodata overstates the holding of *Surfco Haw. v. Fin. Control Sys. Pty, Ltd.*, 264 F. 3d 1062 (Fed Cir. 2001). *Surfco* stands for the proposition that a purchaser of a patented product can make repairs or modify the product unless (a) a condition of the sale prevents repair/modification, or (b) the repair/modification is to the extent that it makes the product a "new article" (i.e., "repair" of a patented product is allowed but "reconstruction" is not). *Id*. at 1065. With respect to the T100s sold subject to the ST&Cs, a condition of sale prevented the modification, and an issue of fact is whether modification of the T100s with a new suspension is a "repair" or a "reconstruction". D278; EA 362, p. 6485.

## V. PLAINTIFF'S ISSUE E: AIS WAIVED ITS COUNTERCLAIM AND OFFSET DEFENSES BY SELLING GYRODATA REPAIR PARTS

AIS sold Gyrodata parts for making repairs and now sues Gyrodata for making those repairs. P139; SACC. AIS's actions are so inconsistent with the right to preclude repairs as to induce a reasonable belief that such right has been relinquished. *See, e.g., Ganley v. Cnty. of San Mateo*, No. C06-3923 TEH, 2007 WL 4554318, at *12 (N.D. Cal. Dec. 20, 2007). Waiver does not require perfect knowledge, only sufficient awareness of the circumstances and consequences of one's actions. *In re*

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOSANGELES, CALIFORNIA 90071

*Acosta*, 182 B.R. 561, 566 (N.D. Cal. 1994).

BAE/AIS conceded that "there is nothing today that prevents Gyrodata from repairing their own gyros …." EA 417-18, pp. 7535-42; EA 451, pp. 7834-35. They were right. *Surfco*, 264 F.3d at 1065-66. In March 2007, Gyrodata told BAE's Art Siegel it had developed a new suspension and invited BAE to study it. Klopp Decl., ¶ 10 (EA 11, p. 861). In April 2007, BAE "suspect[ed] that Gyrodata/ALL TECH are using BAE drawings and/or IP" for a suspension and wondered "[s]hould this be pursued legally and if so[,] how?" EA 451, pp. 7835. On May 23, 2007, four BAE employees visited Alltech and then Gyrodata and were *handed* the suspension, along with a test sheet for it. Brosnahan Decl., ¶¶ 4, 7 (EA 3, pp. 638-39); Golden Decl., ¶¶ 11-12 (EA 6, pp. 706-07), Uttecht Decl., ¶¶ 19-22 (EA 11, 864-66). Gerber "couldn't believe how similar it looked to the flexures that we were involved with." Gerber Tr. (12/3/09), 84:17-20, 85:6–87:2; *see* EA 449, p. 7828. BAE believed the Alltech suspension "had some features of our current suspension coupled with new design ideas which had some similarity to our newly designed T70 suspension" and Gyrodata was repairing T-100s with it. EA 449, p. 7828. BAE took two months to consider its options and consulted counsel at least eight times before making a decision. *Compare*, EA 449, p. 7828, *with* EA 510, pp. 8908-10, *and* EA 328, pp. 6220-21. Art Siegel, BAE's highest officer, decided to sell Gyrodata T-100 replacement parts, knowing they would be used to repair T-100 gyroscopes, but put a high markup on them to compensate itself for the intellectual property. P130; Gerber Tr. (12/3/09), 101:5-23, 102:11-16; Brosnahan Decl., ¶ 15, Ex. 4 (EA 3, pp. 641-42, 655-56); *see, e.g.*, EA 401, p. 7386. BAE sold Gyrodata hundreds of repair parts. Brosnahan Decl., ¶ 15 (EA 3, pp. 641-42). Gyrodata advised AIS that it was repairing T-100s with the Alltech suspension, sent it a T-100 with an Alltech suspension and urged it to use the suspension in future T-100 orders. Uttecht Decl., ¶¶ 22-23 (EA 11, pp. 866-67); Klopp Decl., ¶¶ 13-14 (EA 8, pp. 832-33); Brosnahan Decl., ¶¶ 5, 8, 13, 15 (EA 3, pp. 639-40, 641-42); Golden Decl., ¶¶ 10-12 (EA 6, pp.

706-07). BAE continued the sales through 2008 after acquiring this knowledge, and Gerber admitted that BAE had "condoned" Gyrodata's repair activities. EA 426, p. 7594. AIS's own pleadings admit it "*granted Gyrodata a limited license to repair T-100s ….*" SACC, ¶ 42 (EA 473, p. 8206).

Defendants cannot circumvent the absence of properly pled affirmative claims with an unclean hands defense. Gyrodata cannot have unclean hands for non-disclosure when it literally placed the suspension into BAE's hands twice. It is Defendants whose hands are sullied. They confessed that they intended to "build a case" by encouraging repairs but decided to "hold off for now to protect ourselves from any potential legal action [a Gyrodata T70 breach claim]." EA 451, pp. 7834-35. The alleged bad conduct was known by BAE before it decided to sell Gyrodata repair parts and consisted of Gyrodata using intellectual property it owns.

Defendants' "restriction" arguments also fail. BAE permitted the parts to be used "for repairing T-100 Gyroscopes," which is exactly how they were used. Golden Decl., ¶¶ 16-17 (EA 6, p. 708). Defendants sold Gyrodata dinner; they cannot complain that Gyrodata ate it. If the language is so read, it renders the entire repair parts sale useless. Brosnahan Decl., ¶ 16 (EA 3, pp. 6-7); Golden Decl., ¶ 17 (EA 6, p. 708). After the alleged restrictions were expressed in a price quote, the parties formed contracts for the sale of T-100 repair parts in the same way they did for the sale of T-100s. Gyrodata issued a purchase order containing no restrictions on use of the repair parts and BAE/AIS signed it but attempted to expressly conditioned its acceptance on Gyrodata's assent to BAE/AIS' ST&Cs. *See, e.g.*, EA 185, pp. 3248, 3246. Just as with the T-100 orders, Gyrodata gave no such consent. Brosnahan Decl., ¶ 16 (EA 3, pp. 6-7). Thus, with respect to the repair parts order, like the T-100 orders, restrictive provisions proposed earlier by BAE/AIS never became part of the contracts. *See supra,* Plaintiff's Motion No. 1.

**DEFENDANTS' RESPONSE**

1. There Is No Waiver of the Counterclaim

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

Material factual issues require denial of Gyrodata's claim that AIS waived its counterclaim and offset defense by consenting to Gyrodata's repair of T100s, and by supplying repair parts. AIS's sale of replacement parts was made subject to an express restriction on Gyrodata's ability to use AIS IP and precluded Gyrodata from manufacturing T100s. (D256, EA185, pp. 3246-55, EA328, p. 6220). More directly, waiver requires an intentional relinquishment of a known right. *See Old Republic Ins. Co. v. FSR Brokerage, Inc.*, 80 Cal.App.4th 666, 680 (2000). Gyrodata has not presented evidence that AIS knew that Gyrodata was using the suspension copied from AIS IP, which AIS only learned after Gyrodata sued it and produced the drawings in discovery. (D267, Gerber Decl. ¶¶23-25, 28, EA5, pp. 697-99; Mariani Decl. ¶¶2-3, EA9, p. 852). Whether Gyrodata is repairing as opposed to manufacturing T100s that it markets as new sensors is also disputed. In fact, had AIS known that Gyrodata contracted with New Condor to "modify" T100s with AIS' suspension design, it would not have consented to sell Gyrodata "repair" parts. (D296, EA5, p. 694).

2. Factual Issues Regarding Plaintiff's Unclean Hands

Gyrodata's motion must fail because triable issues exist as to whether Gyrodata has unclean hands preventing all of its claims. *Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 978-79 (1999) (unclean hands doctrine applies to bar fraud and contract claims, especially where misconduct is intertwined with claimed injuries); *see also Unilogic v. Burroughs Corp*., 10 Cal. App. 4th 612, 621 (1993); *Dollar Systems, Inc. v. Avcar Leasing Systems, Inc.*, 890 F.2d 165 (9th Cir. 1989). During the T70 development years, 2006-2008, Gyrodata, secretly and without authorization, copied the T70 suspension design that BAE Inertial was attempting to manufacture for the T70, both to modify its T100 gyros and then to manufacture its own T70 like gyro. (D180-D185, D193-D194, D215-D217, D224-D229, D230-D253, D263-266, EA291, pp. 6019-31, 5992-7; EA263, pp. 5170-8; EA5, pp. 694-700, EA318, p. 6188). Weeks after joining Gyrodata in 2006, Mr.

Golden secretly engaged a company called Alltech to make suspensions for Gyrodata's T100 gyro "modifications" based on a copy of BAE Inertial's design. D216-D218, Golden Tr. 5/7/10, 277:13-20; Golden Tr. 1/06/12, 240:12-247:17. The design drawings for Gyrodata's "Alltech" suspension are visually identical to BAE Inertial's T70 design (see D224, EA471, pp. 8172-4), and expert analysis shows that the dimensions are also substantially identical. (D226-229, EA291, p. 5992-97).[52] It was not until May 2007 that AIS learned that Gyrodata was manufacturing Alltech suspensions. But Gyrodata then misled AIS by representing that the Alltech suspension was "independently developed by Gyrodata." *See* Opp. to P129. [53] Gyrodata also misrepresented that it would not manufacture any gyros on its own, and said that it would provide the Alltech design to Defendants for inspection. (D248, D253, EA1, p. 3-4). Gyrodata cannot dispute that it withheld the Alltech suspension design drawings in 2007 and 2008. Its own documents show that it did enter into the gyro manufacturing business on its own. (D255, D259-260, D264-D266, EA259, p. 5147). Gyrodata has "modified" hundreds of T100 gyros with Alltech suspensions and markets them as the "new ruggedized sensor" it developed and manufactured and has also used a smaller version of the design in its "MXY/GWD70"), installing it in Litton's G-2000 gyros (D264, D297, EA518, p. 8948), profiting over $64 million from these activities -- all the subject of Defendants' unclean hands defense. (*Id; see also* D264-D266). These facts preclude summary judgment on Plaintiff's motion.

---

[52] Golden described his secret activities as "fiendishly clever" and "deviously sleazy", and Uttecht wrote "what did the buzzard…say…? Patience my ass, let's kill something". (D279-280, EA516, p. 8923, EA517, p. 8926). Golden's self-serving declaration in opposition that he did not misuse any IP is insufficient to overcome the clear evidence of misuse of IP presented by Defendants' experts. (D226-228).

[53] "Even where no duty to disclose would otherwise exist, where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated." *Hynix Semiconductor Inc. v.Rambus Inc.*, 441 F. Supp. 2d 1066, 1076-77 (N.D. Cal. 2006) (quotation omitted); *see also Lingsch v. Savage*, 29 Cal. Rptr. 201, 213 Cal. App. 2d 729 (1963); Cal. Civ. Code § 1710.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOSANGELES, CALIFORNIA 90071

**PLAINTIFF'S FURTHER RESPONSE: VIOLATION OF PAGE LIMITS AND BRIEFING AGREEMENTS**

Gyrodata also objects to Defendants' failure to follow court-ordered briefing protocol. The Court allowed each side 30 pages and warned that circumvention of page limits or failure to cooperate would cause the motions to be stricken and denied. ECF No. 423. Defendants ignored the warning, using 33 footnotes (7-1/2 pages double-spaced) to gain a nearly four-page extension. EA 503, p. 8782-90. BAE is a repeat offender. EA 504, p. 8791-94. The parties agreed to exchange draft motions and responses on March 12 and April 9, **final** moving papers on April 19, and **final** oppositions on April 25. EA 505, p. 8795-00; EA 506, p. 8801-06; EA 507, p. 8807-18. But, one week after final moving papers were due, Defendants made hundreds of changes, including new arguments, legal citations, and evidence. EA 508, p. 8819-66. Plaintiff objected; AIS made modest changes to attempt compliance, but BAE continues to add new argument and proof up to and including the day before filing, for which no response is possible. *Id.*; EA 509, p. 8867-07. Gyrodata moves that all of BAE's motions (3, 7-9) be stricken. ECF No. 423.

**RESPONSE TO GYRODATA'S MOTION TO STRIKE**

Plaintiff has attempted, just minutes before this joint brief has to be filed, to insert an application to strike Defendants' motions. Plaintiff's statements are misleading and incorrect. Defendants have not had an opportunity to respond, will respond if and when appropriate, and ask the court to disregard Gyrodata's motion.

Dated: April 30, 2012

FULKERSON LOTZ LLP
Thomas Fulkerson
Wesley G. Lotz

MANATT, PHELPS & PHILLIPS
Chad S. Hummel
Emil Petrossian

By: */s/ Thomas Fulkerson*
Thomas Fulkerson
Attorneys For Plaintiff
GYRODATA INCORPORATED

Dated: April 30, 2012

DYKEMA GOSSETT LLP
Lee Horton
Craig N. Hentschel
S. Christopher Winter

By: */s/ Craig N. Hentschel*
Craig N. Hentschel
Attorneys For Defendant
ATLANTIC INERTIAL SYSTEMS INC.

Dated: April 30, 2012

BUCHANAN INGERSOLL & ROONEY PC
Mary Sue Henifin
Robert Edmunds
George Benaur

By: */s/ Mary Sue Henifin*
Mary Sue Henifin
Attorneys For Defendants
BAE SYSTEMS, INC. BAE SYSTEMS CONTROLS INC., AND BAE SYSTEMS INFORMATION AND ELECTRONIC SYSTEMS INTEGRATION INC.

PAS01\318908.2
ID\CNH - 105968/0001

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071